**In the Interest of D.L.N., a Child.**

**No. 10–97–178–CV.**

Court of Appeals of Texas,
Waco.

Dec. 23, 1997.

Keith C. Cameron, Naman, Howell, Smith & Lee, P.C., Waco, for appellant.

John W. Segrest, Crim. Dist. Atty., Laura M. Alaniz, Asst. Crim. Dist. Atty., Waco, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

Following a jury trial, LaJune Bowden's parental rights to her daughter, D.L.N., were terminated by the trial court. *See* TEX.FAM. CODE ANN. § 161.001 (Vernon Supp.1998). On appeal Bowden claims the evidence is legally and factually insufficient to support an involuntary termination of her parent-child relationship with D.L.N.

### I.   Factual Background

D.L.N. is the youngest of Bowden's five children. Bowden's two sons live in Michigan with their paternal grandmother and her other two daughters live with her. After D.L.N. was born, Bowden moved into a home without running water or electricity. Bowden testified that in 1993 D.L.N. began living primarily with Rosie and Cindy Dotson because a worker from the Texas Department of Protective and Regulatory Services (TDPRS) told Bowden that the conditions in her home made it an inappropriate place for D.L.N. to live. D.L.N. lived with the Dot-

sons for at least a year and a half. During this time the Dotsons provided D.L.N.'s food, clothing, and other necessities, except for some diapers and medicine initially provided by Bowden. Cindy Dotson stated that Bowden's visits to see D.L.N. would sometimes be weeks or months apart, but the longest time she went without seeing D.L.N. was four months. When Bowden came to see D.L.N., she would take D.L.N. to her house for about two days, and then the Dotsons would bring D.L.N. back to their home.

In February 1995, Cindy Dotson and several other adults took a group of children to a park to play. However, after a fight began in the park, Cindy decided to take the children home, and D.L.N. was inadvertently left behind. Later, D.L.N. was found at an apartment complex and the police were called. Shortly after this incident D.L.N. was placed in foster care by TDPRS.

While D.L.N. was in foster care, TDPRS formulated a "Family Service Plan" detailing various tasks for Bowden to accomplish in order to regain custody of D.L.N. Workers from TDPRS testified at the trial that Bowden did not consistently attend the counseling sessions, parenting classes, or visitation schedule[1] prescribed by TDPRS, and thus, TDPRS decided to seek a termination of Bowden's parental rights to D.L.N. so she could be adopted by another family.

A jury trial was conducted in December 1996 to determine if a termination should occur. At the trial TDPRS alleged two possible grounds for the termination of Bowden's parental rights: (1) voluntarily leaving the child alone or in the possession of another without providing adequate support for the child and remaining away for a period of at least six months or (2) engaging in conduct or knowingly placing the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* Tex.Fam.Code Ann. § 161.001(1)(C), (E) (Vernon Supp.1998). TDPRS also alleged that it would be in D.L.N.'s best interest to terminate Bowden's parental rights. *See* Tex.Fam.Code Ann. § 161.001(2) (Vernon Supp.1998). In response to the single question in the charge asking if the parent-child

relationship between Bowden and D.L.N. should be severed, the jurors unanimously answered in the affirmative, and the trial court entered a judgment terminating Bowden's parental rights.

## II. Points of Error

■■■ Bowden has appealed the judgment of termination claiming that there is "no evidence" or factually-insufficient evidence to support the termination of her parental rights. On appeal, an involuntary termination of parental rights must be strictly scrutinized because termination proceedings involve the fundamental constitutional rights surrounding the parent-child relationship. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985); *Ybarra v. Texas Dep't of Human Services,* 869 S.W.2d 574, 576 (Tex.App.— Corpus Christi 1993, no writ); *Clay v. Texas Dep't of Human Resources,* 748 S.W.2d 598, 600–01 (Tex.App.—Waco 1988, no writ). A termination of parental rights is an irrevocable act severing the parent-child relationship for all purposes, except for the right of inheritance. *See* Tex.Fam.Code Ann. § 161.206(b) (Vernon 1996); *Holick,* 685 S.W.2d at 20. Because a termination involves rights of "constitutional dimension," the grounds for termination must be proved by clear and convincing evidence. *See* Tex.Fam.Code Ann. § 161.001 (Vernon Supp.1998), § 161.206(a) (Vernon 1996); *Richardson v. Green,* 677 S.W.2d 497, 500 (Tex.1984); *In re J.J.,* 911 S.W.2d 437, 439 (Tex.App.—Texarkana 1995, writ denied).

■■■ We begin by addressing Bowden's "no evidence" or legal sufficiency claim. A no evidence point is decided by the appellate court considering the evidence and inferences supporting the jury's findings to determine if more than a scintilla of evidence in the record supports the jury's answers to the questions in the charge. *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996); *Lucas v. Texas Dep't of Protective and Regulatory Services,* 949 S.W.2d 500, 502 (Tex.App.—Waco 1997, pet. filed). A "no evidence" challenge fails "[i]f there is any evidence of probative force to support the finding." *Leitch,* 935 S.W.2d

---

1. Bowden missed some visits and was late for others.

at 118. Furthermore, because multiple grounds for termination were alleged by TDPRS and the court submitted this issue using a broad form question simply asking the jury whether the parent-child relationship should be terminated, the jury's answer will be upheld if any of the grounds for termination which were pled by TDPRS support the jury's answer. *See Edwards v. Texas Dep't of Protective and Regulatory Services*, 946 S.W.2d 130, 135 (Tex.App.—El Paso 1997, no writ); *see also Texas Dep't of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990).

■ Section 161.001(1)(C) of the Family Code allows an involuntary termination of parental rights by the court if it is proved that a parent has:

> voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months.

TEX.FAM.CODE ANN. § 161.001(1)(C). Bowden contends that the evidence supporting this ground of termination fails because, while TDPRS showed D.L.N. had lived with the Dotsons for at least eighteen months, Cindy Dotson stated that Bowden came to visit every few weeks or months. Cindy Dotson further testified that the longest time Bowden ever stayed away without visiting was four months. In response to Bowden's argument, TDPRS has argued that the statute does not require a parent to remain away for six consecutive months, so long as a parent remains away for a total of six months without providing adequate support.

■ We must look at the plain and common meaning of "remained away for a period of at least six months" to determine if the law requires that these be six consecutive months of absence. *See Memorial Hosp.-The Woodlands v. McCown*, 927 S.W.2d 1, 4 (Tex.1996); *Lanier v. Stem*, 931 S.W.2d 1, 2–3 (Tex.App.—Waco 1996, orig. proceeding). The language used in this subsection indicates that a parent must remain away from a child for a minimum of six months, without providing adequate support, in order to have his or her parental rights terminated under this provision. *See* TEX.FAM.CODE ANN.

§ 161.001(1)(C). Thus, because a parent should not face a termination on this ground until the minimum time-period of six months has passed, we believe the legislature intended that the six month time-period consist of six consecutive months. *See id.* In addition to the plain language of the statute, other appellate courts have concluded that when a parent's rights are terminated for failing to support a child for one year under section 161.001(1)(F) the "year" referred to in the statute means twelve consecutive months. *See* TEX.FAM.CODE ANN. § 161.001(1)(F) (Vernon Supp.1998); *In re Z.W.C.*, 856 S.W.2d 281, 283 (Tex.App.—Fort Worth 1993, no writ); *In re A.D.E.*, 880 S.W.2d 241, 246 (Tex.App.—Corpus Christi 1994, no writ). Finally, our interpretation of section 161.001(1)(C) to require six consecutive months of absence is consistent with the Supreme Court's directive that involuntary termination statutes be strictly construed in favor of the parent. *See Holick*, 685 S.W.2d at 20. Because TDPRS failed to show Bowden remained away from D.L.N. for six consecutive months, we conclude the evidence is not legally sufficient to support an involuntary termination of Bowden's parental rights under section 161.001(1)(C). Consequently, we must decide if the alternative ground for termination pled by TDPRS will support the trial court's judgment.

■ Section 161.001(1)(E), (2) of the Family Code allows a severance of the parent-child relationship if the parent has:

> (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;
>
> . . . .
>
> and
>
> (2) that termination is in the best interest of the child.

TEX.FAM.CODE ANN. § 161.001(1)(E), (2). In seeking an involuntary termination, TDPRS must prove both that the parent engaged in the conduct listed in subsection E and that the termination is in the best interest of the child. A termination cannot be based only upon what the trial court determines would be in the best interest of the child. *Texas*

*Dep't of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987); *Clay,* 748 S.W.2d at 601.

The Supreme Court in both *In re M.C.* and *Boyd* stated that the term "endanger" used in subsection E means that the child has been exposed to loss or injury or is jeopardized as a result of the parent's conduct. *In re M.C.,* 917 S.W.2d 268, 269 (Tex. 1996); *Boyd,* 727 S.W.2d at 533. The conduct engaged in by the parent need not have created an actual, concrete threat of injury to the child's physical or emotional health, but the endangerment must involve "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd,* 727 S.W.2d at 533. Additionally, the Supreme Court emphasized in *In re M.C.* that neglect can endanger a child's well-being as easily as abusive behavior. 917 S.W.2d at 270.

While in the instant case we cannot point to any one specific act committed by Bowden which, standing alone, justifies the termination of her parental rights to D.L.N., we believe there is more than a scintilla of evidence that Bowden engaged in a "course of conduct" which endangered D.L.N.'s physical or emotional well-being. *See Harris v. Herbers,* 838 S.W.2d 938, 942 (Tex.App.—Houston [1st Dist.], no writ); *see also Boyd,* 727 S.W.2d at 534. The evidence presented at trial showed Bowden had a quick temper which could lead to violent behavior. Mary Debose, Bowden's grandmother, testified that, in 1995 when TDPRS placed D.L.N. in foster care, Bowden had a bad temper such that, "You couldn't say anything to her. [Bowden] would fly all off the handle, curse you out, call you terrible names, and she just—I don't know—she acted like somebody that was crazy or something, going crazy." For example, while Bowden was pregnant with D.L.N., she and Debose got into an argument which led to Bowden hitting or pushing Debose so that both women fell to the floor fighting. Debose stated that Bowden's children saw this fight and one of Bowden's daughters assisted Bowden's sister in separating the women. Bowden also threatened to burn Debose's home to the ground.

Bowden testified that in 1993 she stabbed someone with a screwdriver to defend herself in a fight, and in 1995 she was arrested for assault. However, Bowden stated that she did not engage in any fighting during the 1995 incident but merely tried to break-up the fight. Also, Cindy Dotson stated that she had seen Bowden and Dennis Nobles[2] engage in fights while Bowden's children were present, "He would push her. She would yell. She'd push him. They would fight." Dotson also said she had seen Bowden yell and cuss at D.L.N. when she was a baby and would not stop crying. In particular, Cindy remembered having to come over to Bowden's house one night after Bowden called and said: "'You-all come get this spoiled baby. You-all are spoiling her. You all come get her.'"

Moreover, the jury could conclude, after viewing the evidence, that Bowden had established a pattern of neglecting D.L.N.'s physical and emotional needs which endangered her well-being. After D.L.N. was born, Bowden moved the family into a home without electricity or water. Then, after D.L.N. went to live with the Dotsons, Bowden failed to provide for D.L.N.'s support. Cindy Dotson testified that, when D.L.N. moved in with the Dotsons, Bowden initially provided some diapers for D.L.N. and some medicine, but in the following year and a half Bowden did not provide anything for D.L.N.'s support, except that Bowden or the Dotsons used her Medicaid card to obtain additional medicine for D.L.N. While admitting that Bowden had financial difficulties, Cindy Dotson stated that Bowden did not do all that she could have done to support D.L.N. Cindy Dotson told the jury that she and her mother got tired of asking for support so they simply provided for D.L.N.'s physical needs because they did not want D.L.N. to go without. Additionally, Dotson said that, when Bowden took D.L.N. to her house to visit, D.L.N. would sometimes come back with injuries which ranged from cuts and scrapes to a swollen arm in a cast and a

2. Dennis Nobles was Bowden's boyfriend, and Bowden testified that she thought he was D.L.N.'s father before blood tests proved that D.L.N.'s father was another man.

burn that had to be bandaged by a doctor. Dotson said she understood from Bowden that these injuries came from rough play between the children, but Dotson expressed that she and her mother "would always be afraid when [Bowden] would say that she was coming to get her."

Dotson also informed the court that, prior to D.L.N. living full-time at the Dotsons, Bowden would leave D.L.N. at other people's homes who would call the Dotsons to come get D.L.N. Dotson testified in particular that Bowden would leave D.L.N. with Cheetah and Faye, but that they were "not good" people. Dotson explained that Cheetah and Faye would leave and walk down the street leaving their older children to watch D.L.N. Dotson said she did not trust Cheetah and Faye to watch D.L.N. because she always came back with a cut or a bruise. After Bowden left D.L.N. with Cheetah and Faye, either they or their children would call the Dotsons to come get D.L.N., "[T]hey would call and yell and scream, 'Come and get her. She's too spoiled.'"

Further, Bowden exhibited a course of behavior showing her inability to deal with D.L.N.'s emotional needs. Three witnesses testified that Bowden did not have an emotional attachment to D.L.N. Dr. Shinder, a licensed clinical psychologist, stated that Bowden lacked bonding with D.L.N. and he did not foresee that this would change in the future. Cindy Dotson believed Bowden provided no nurturing benefits to D.L.N., and Eleanor Van Domelen, a CASA volunteer who observed visits with Bowden and D.L.N., testified that she observed no closeness between mother and daughter during Bowden's visits. During her visits with D.L.N., Bowden was frequently late and she had little meaningful interaction with D.L.N. Van Domelen explained that Bowden often only combed D.L.N.'s hair during her visits, but she would talk to other individuals whom she brought with her to the visits. Van Domelen further testified that D.L.N. was indifferent to visits from her mother. Cindy Dotson also discussed Bowden's interest in visiting D.L.N. Dotson explained that when D.L.N. lived with her Bowden did not show any interest in visiting D.L.N. herself, but when

Dennis Nobles came to town Bowden would want D.L.N. for a visit.

■ The jurors could also consider evidence showing how Bowden treated D.L.N.'s two sisters who lived full-time with Bowden in deciding if Bowden engaged in a course of conduct which endangered the physical or emotional well-being of D.L.N. From Bowden's neglect of her other two children who lived with her, the jury could infer that D.L.N. was similarly treated before she came to live with the Dotsons, while visiting with Bowden, and that D.L.N. would face this type of treatment in the future if returned to Bowden's care. *See In re B.R.,* 950 S.W.2d 113, 119 (Tex.App.—El Paso 1997, no writ) (the jury may consider violent or negligent conduct directed at a spouse or other children under TEX.FAM.CODE ANN. § 161.001(1)(E)); *see also Trevino v. Texas Dep't of Protective and Regulatory Services,* 893 S.W.2d 243, 248 (Tex.App.—Austin 1995, no writ). Cindy Dotson described D.L.N.'s two sisters as being clothed in dirty "pee-stained" t-shirts and she stated that they sometimes went without shoes in public places. Lou Brinegar, the vice principal at the girls' elementary school, agreed that the children had an unkempt appearance and very undesirable hygiene on many occasions. He testified that the school nurse had to send the girls home when they showed up at school with undesirable hygiene. Brinegar indicated that both girls have discipline problems and one child had been suspended for fighting. Furthermore, Brinegar said he went to Bowden's home to talk to her about the girls' problems, but Bowden ignored him.

■ Consequently, we find that the record contains legally sufficient evidence to support an involuntary termination under section 161.001(1)(E) of the Family Code. We need not discuss the sufficiency of the evidence showing that termination is in the best interest of D.L.N. because the appellant does not argue that the record contains insufficient evidence showing that termination might be in the best interest of D.L.N., and we believe that the record contains this evidence. Bowden's legal sufficiency point is overruled.

In considering Bowden's factual sufficiency point, we recognize that there is a conflict among the courts of appeals regarding the appropriate standard of review to be applied by an appellate court to decide factual sufficiency claims when the burden of proof at trial requires clear and convincing evidence. *See, e.g., Lucas,* 949 S.W.2d at 502–03 n. 3. Some of the courts of appeals have adopted an intermediate standard of review to be used in cases which must be proved at trial by clear and convincing evidence. *See Edwards v. Texas Dep't of Protective and Regulatory Services,* 946 S.W.2d 130, 135–37 (Tex.App.—El Paso 1997, no writ) (holding that the appellate court should review "whether the evidence was sufficient to produce in the mind of the fact finder a firm belief or conviction as to the truth of the allegations sought to be established"); *see also In re H.C.,* 942 S.W.2d 661, 663–64 (Tex.App.—San Antonio 1997, no writ); *Slatton v. Brazoria County Protective Services Unit,* 804 S.W.2d 550, 556 (Tex.App.—Texarkana 1991, no writ); *Williams v. Texas Dep't of Human Services,* 788 S.W.2d 922, 926 (Tex.App.—Houston [1st Dist.] 1990, no writ); *In re L.S.,* 748 S.W.2d 571, 572–73 (Tex.App.—Amarillo 1988, no writ); *cf. Wetzel v. Wetzel,* 715 S.W.2d 387, 389 (Tex.App.—Dallas 1986, no writ). Other courts have expressly refused to adopt a higher standard of review or have continued to apply the traditional factual sufficiency standard. *Spurlock v. Texas Dep't of Protective and Regulatory Services,* 904 S.W.2d 152, 155–56 (Tex.App.—Austin 1995, writ denied); *In re W.S.,* 899 S.W.2d 772, 776 (Tex.App.—Fort Worth 1995, no writ); *In re J.F.,* 888 S.W.2d 140, 141 (Tex.App.—Tyler 1994, no writ); *In re A.D.E.,* 880 S.W.2d 241, 245 (Tex.App.—Corpus Christi 1994, no writ); *Fite v. Nelson,* 869 S.W.2d 603, 605–06 (Tex.App.—Houston [14th Dist.] 1994, no writ); *cf. Dupree v. Texas Dep't of Protective and Regulatory Services,* 907 S.W.2d 81, 83 (Tex.App.—Dallas 1995, no writ).

While we believe the evidence, in the instant case, would be factually sufficient to support the termination of Bowden's parental rights under either the traditional factual sufficiency standard or the intermediate standard of review, we will continue to apply the traditional factual sufficiency standard which has been adopted by the Supreme Court, *i.e.,* that the appellate court must consider all the evidence in the record to determine if the jury's answer is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The fact that the grounds for an involuntary termination must be proved at trial by clear and convincing evidence does not alter the factual sufficiency review which we have been directed by the Supreme Court to undertake on appeal. *D.O. v. Texas Dep't of Human Services,* 851 S.W.2d 351, 353 (Tex.App.—Austin 1993, no writ); *In re W.S.,* 899 S.W.2d at 776. Because the Supreme Court has not directly addressed this issue, in reaching our decision we have considered the opinions of the other courts of appeals and the arguments of counsel to decide that the better approach to resolve factual sufficiency points is to continue applying the factual sufficiency standard already established by the Supreme Court. We do not believe that, just because the clear and convincing evidence burden of proof is stricter than the typical preponderance standard, this necessitates a re-formulation of the factual sufficiency standard of review. As TDPRS pointed out during oral argument, the burden of proof during a criminal trial is also heightened to "beyond a reasonable doubt," but the Court of Criminal Appeals has adopted the Supreme Court's traditional factual sufficiency standard, thus "harmoniz[ing] the criminal and civil jurisprudence of this State with regard to appellate review of questions of factual sufficiency." *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App. 1996).

The focus of Bowden's argument that her parental rights should not be terminated centers around testimony claiming that, since D.L.N. was removed from Bowden's care, Bowden has exhibited greatly improved parenting skills, and thus Bowden's rights to D.L.N. should not be severed because TDPRS has not shown that D.L.N. will be endangered in the future if she is re-

turned to Bowden's custody. Bowden contends that the acts of misconduct proved by TDPRS reflect conditions that no longer exist. *See Wetzel v. Wetzel*, 715 S.W.2d 387, 390–91 (Tex.App.—Dallas 1986, no writ) (abuse occurred four years earlier and mother appeared to be cured of her mental disorder, thus posing no future danger to her children); *see also Hendricks v. Curry*, 401 S.W.2d 796, 800 (Tex.1966). The changed circumstances Bowden specifically points out are that her schizophrenia is under control through medication, she has removed the inappropriate signs which used to be displayed on the front of her home,[3] and she has better control of her temper so past violent behavior will not re-occur. Bowden's evidence presented at trial also reflected that she now lived in better housing, she had attended parenting classes, and she exhibited improved interaction with D.L.N. during visits.

■ After considering Bowden's contention, we believe that the evidence is factually sufficient to support the termination because the jury could reasonably have concluded that Bowden's acts which endangered D.L.N. did not occur in the "distant past" and that these acts could re-occur in the future. *See Navarrette v. Texas Dep't of Human Resources*, 669 S.W.2d 849, 851 (Tex.App.—El Paso 1984, no writ) (concluding that the evidence showed years of neglect "broken only by small improvements shortly before the termination hearing"). While Bowden stated that she was now taking her medication to control the schizophrenia which may have caused some of her behavior, Dr. Shinder testified that Bowden's schizophrenia would continue to worsen as she got older, and TDPRS presented evidence that Bowden had a history of not following her doctor's recommendations for medication. Additionally, in considering Bowden's past violent behavior, courts often look at a parent's conduct both before and after a child is born to determine if the parent has engaged in conduct that endangers the child's physical or emotional well-being. *Dupree v. Texas Dep't of Protective and Regulatory Services*, 907 S.W.2d 81,

84 (Tex.App.—Dallas 1995, no writ); *Navarrette*, 669 S.W.2d at 852. Furthermore, even after D.L.N. was placed in foster care, witnesses testified that Bowden continued to exhibit an inability to meet the emotional needs of D.L.N. Bowden had little meaningful interaction with D.L.N. during visits, often focusing on talking to the individuals who had accompanied her to the visits, and she continued to exhibit no closeness with D.L.N. In deciding whether Bowden's rights should be terminated, the jurors could also consider Bowden's neglect of the physical and emotional needs of D.L.N. and her two sisters to decide that Bowden engaged in a course of conduct which endangered D.L.N. We therefore conclude that the jury's verdict is supported by factually sufficient evidence. Bowden's factual sufficiency point is overruled.

The trial court's judgment is affirmed.

VANCE, J., concurring.

VANCE, Justice, concurring.

We acknowledge that a determination of an involuntary termination of parental rights must be strictly scrutinized. We also acknowledge that, because a termination involves rights of "constitutional dimension," our statutes require, consistent with due process, that the grounds for termination must be proved by clear and convincing evidence. *See* TEX.FAM.CODE ANN. §§ 161.001, 161.206(a) (Vernon 1996 & Supp.1998); *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388, 1403, 71 L.Ed.2d 599 (1982) (citing *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). We still, however, review those findings in the same way as findings made by a preponderance of the evidence.

I continue to believe that other courts of appeal are on the right course when they say that a higher burden of proof, *i.e.*, clear and convincing evidence, for determination of fact issues at trial calls for a different standard for factual-sufficiency review on appeal. *See, e.g., Edwards v. Texas Dep't of Protective and Regulatory Services*, 946 S.W.2d 130,

---

**3.** Outside her home Bowden had displayed a poster saying, among other things, "Don't no whores stay here. Wrong house. Downstairs." and "Rubber costs a dollar."

135–37 (Tex.App.—El Paso 1997, no writ) (holding that the appellate court should review "whether the evidence was sufficient to produce in the mind of the factfinder a firm belief or conviction as·to the truth of the allegations sought to be established"); *In re H.C.,* 942 S.W.2d 661, 663–64 (Tex.App.—San Antonio 1997, no writ); *Slatton v. Brazoria County Protective Services Unit,* 804 S.W.2d 550, 556 (Tex.App.—Texarkana 1991, no writ); *Williams v. Texas Dep't of Human Services,* 788 S.W.2d 922, 926 (Tex.App.—Houston [1st Dist.] 1990, no writ); *Interest of L.R.M. and J.J.M.,* 763 S.W.2d 64, 66 (Tex.App.—Fort Worth 1989, no writ); *Wetzel v. Wetzel,* 715 S.W.2d 387, 389 (Tex.App.—Dallas 1986, no writ); *Neiswander v. Bailey,* 645 S.W.2d 835, 835–36 (Tex.App.—Dallas 1982, no writ); *see also* Bill Vance, *The Clear and Convincing Evidence Standard in Texas: A Critique,* 48 BAYLOR L.REV. 391, 415 (1996).

Our constitution and statutes provide for one level of appeal as a matter of right in termination cases and a factual-sufficiency-of-the-evidence review of determinations made by the factfinder. Thus, one could argue that when constitutional rights are affected by fact determinations made under a higher burden of proof at trial, the affected party has a constitutionally-protected interest in those determinations being reviewed in a way that insures that the due-process standard was met at trial. *See M.L.B. v. S.L.J.,* —— U.S. ——, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (equal protection requires state to provide transcript in appeal of right to indigent parent whose parental interest was terminated) (decisions concerning access reflect both equal protection and due process concerns). That is to say, the rationale of *Addington, Santosky,* and the "*Griffin*-line cases" described in *M.L.B.* dictates that a different (higher) standard of review be applied on appeal to fact determinations made at trial under the clear-and-convincing-evidence standard required by due process. I do not believe that the current standard of review provides that kind of protection.

Finally, saying that the Court of Criminal Appeals' adoption of the traditional factual sufficiency review standard bolsters the case for maintaining the current standard in civil cases also fails to persuade me. *See Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App. 1996). I believe that the *Clewis* standard wrongly requires a court of appeals to find that the evidence favors an acquittal before reversing for factual insufficiency, ignoring the possibility that the evidence could preponderate in favor of a conviction and still fall short of proof beyond a reasonable doubt. *See Mata v. State,* 939 S.W.2d 719, 728 (Tex. App.—Waco 1997, no pet.) (Vance, J., concurring).

With these comments, I concur in the judgment.