IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00099-CV

 

In the
Interest of T.L.S. and R.L.P., Children,

 

 

 



From the County Court at Law

Ellis County, Texas

Trial Court No. 67,213CCL

 



Opinion



 








          Deshawn Dismuke appeals from a family
violence protective order issued against him with reference to the children of
his former girlfriend.  He contends in his sole issue that there is no evidence
and factually insufficient evidence to support the court’s finding that he is
likely to commit family violence in the future.  We will affirm.

          Trina Smith is the biological mother
of the children who are the subject of the protective order.  The Department of
Protective and Regulatory Services removed the children from Smith’s home in
late 2003 because of severe injuries.  At the time, Dismuke and Smith were
living together.  Smith told investigators that she suspected Dismuke had
injured the children.  Ultimately, Smith and Dismuke were arrested for injury
to a child.

          DPRS filed a termination suit against
Smith.  The children’s guardian ad litem filed an application for a family
violence protective order on behalf of the children.  The court heard both
matters in the same proceeding.

          On the second day of trial, Smith
agreed to voluntarily relinquish her parental rights and be subject to a
permanent injunction prohibiting her from any further contact with the
children.  DPRS called Dismuke as a witness, but he invoked the Fifth Amendment
and refused to answer any questions.

          Dismuke moved for an “instructed
verdict”[1] on
the basis that the applicant had offered no evidence that he would commit
family violence in the future.  The court denied Dismuke’s motion and issued
the protective order.

          The protective order recites the
following pertinent findings:

          [T]he court finds that Deshawn Dismuke
committed family violence against Petitioners as follows:

 

·       
On or about November 29,
2003 and during the days and weeks preceding, Deshawn Dismuke, acting in
concert with Trina Smith, caused serious bodily injury to the minor child
[R.L.P.] by knowingly breaking his right leg thereby resulting in a spiral
fracture to the tibia.

 

·       
On or about December 23,
2003 and during the days and weeks preceding, Deshawn Dismuke, acting in
concert with Trina Smith, caused serious bodily injury to the minor child
[R.L.P.] by knowingly applying blunt force trauma and a blow to the abdomen
area thereby resulting in the loss of blood, as well as the death and later
removal of approximately 24 inches of the small intestine.

 

·       
In addition to the above
specified acts of family violence, Deshawn Dismuke, acting in concert with
Trina Smith, engaged in an ongoing pattern of serious physical abuse to
[R.L.P.] and/or [T.L.S.] which included numerous non-accidental injuries such
as burns to various parts of the body, arm fractures, cuts and tears to bodily
tissue including a torn frenulum, eye injuries, compression fractures to back
vertebrae, along with conduct resulting in probable sexual abuse.

 

                   The court further finds that
Deshawn Dismuke is likely to commit family violence in the future.

 

          Dismuke contends in his sole issue
that the record contains no evidence or factually insufficient evidence to
support the finding that he is likely to commit family violence in the future
because: (1) the record contains no direct evidence that he will commit family
violence in the future; and (2) the likelihood of future contact between the
children and himself is remote because (a) he is not the biological father of
either child, (b) he is not married to Smith, and (c) Smith’s parental rights
have been terminated and she has been permanently enjoined from further contact
with the children.

          We apply the usual no-evidence and
factual insufficiency standards of review in an appeal from a protective
order.  Pena v. Garza, 61 S.W.3d 529, 532 (Tex. App.—San Antonio 2001,
no pet.).

          The central issue in this appeal is
whether evidence of past family violence will support a finding of a likelihood
of future family violence.  During the last decade, a principle has emerged in
parental termination and child custody cases which recognizes that evidence
that a parent has engaged in abusive or neglectful conduct in the past permits
an inference that the parent will continue this behavior in the future.  See
e.g. Williams v. Williams, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet.
denied); In re K.A.S., 131 S.W.3d 215, 229-30 (Tex. App.—Fort Worth 2004,
pet. denied); In re D.L.N., 958 S.W.2d 934, 941 (Tex. App.—Waco 1997, pet. denied).  As Chief Justice Thomas of this Court presciently observed in a
1992 child custody decision, “Past is often prologue.”  Ray v. Burns,
832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ).  This principle should
apply in family violence protective order cases as well.[2]
 See Pena, 61 S.W.3d at 532 (finding evidence of past conduct “legally and
factually sufficient to sustain the protective order”).

          Here, the trial court expressly found
that Dismuke had engaged in family violence in the past.  Dismuke does not
challenge these findings.  Therefore, they are binding unless the contrary was
established as a matter of law or there is no evidence to support the
findings.  See McGalliard v. Kuhlmann, 722 S.W.2d 694, 696 (Tex. 1986); Zagorski v. Zagorski, 116 S.W.3d 309, 319 (Tex. App.—Houston [14th
Dist.] 2003, pet. denied); Tarrant Regl. Water Dist. v. Gragg, 43 S.W.3d
609, 619 (Tex. App.—Waco 2001), aff’d, 151 S.W.3d 546 (Tex. 2004).

          Having reviewed the evidence in the
record, we initially conclude that more than a scintilla of evidence supports
the unchallenged findings that Dismuke committed family violence against the
children.  From this evidence, the trial court could infer that Dismuke will
likely commit family violence in the future.  See Williams, 150 S.W.3d at
451; K.A.S., 131 S.W.3d at 229-30; D.L.N., 958 S.W.2d at 941. 
Thus, the record contains more than a scintilla of evidence that Dismuke will
likely commit family violence in the future.

          Dismuke also challenges the factual
sufficiency of the evidence to support this finding.  He contends that the
evidence is factually insufficient because the likelihood of future contact
between the children and himself is remote because (1) he is not the biological
father of either child, (2) he is not married to Smith, and (3) Smith’s
parental rights have been terminated and she has been permanently enjoined from
further contact with the children.

          We reject outright Dismuke’s first two
contentions in this regard because his non-parent status and his marital status
did not stop him from committing family violence against the children in the
past.  See Williams, 150 S.W.3d at 451; K.A.S., 131 S.W.3d at
229-30; D.L.N., 958 S.W.2d at 941.  Therefore, the central issue is
whether the termination of Smith’s parental rights and the permanent injunction
preponderate against a finding that Dismuke will likely commit family violence
in the future.

          A finding that Dismuke will not likely
commit future violence requires the factfinder to infer that he will have no future
contact with the children based on one of two underlying inferences.  The first
of these underlying inferences is that, because Smith’s parental rights have
been terminated and she has been enjoined from future contact with the
children, she will comply with the injunction.  The second is that Dismuke will
have no future contact with Smith.  Because neither Dismuke nor Smith
testified, there is simply no evidence in the record from which the trial court
could infer that they will have no future contact with each other.

          Regarding the first underlying
inference, the trial court could only speculate that Smith will comply with the
injunction.  And from that speculation, Dismuke essentially argues that the
court could properly infer that as a result Dismuke will have no future contact
with the children.  For the court to do so, would constitute an impermissible
stacking of inferences.  See Marathon Corp. v. Pitzner, 106 S.W.3d 724,
728-29 (Tex. 2003) (per curiam).  Therefore, we conclude that the evidence is
factually sufficient to support the court’s finding that Dismuke is likely to
commit family violence in the future.

We overrule Dismuke’s sole issue and affirm the
judgment.

 

FELIPE REYNA

Justice

Before Chief Justice
Gray,

Justice
Vance, and

Justice
Reyna

Affirmed

Opinion delivered and
filed June 29, 2005

[CV06]         









[1]           In a nonjury proceeding, the proper
procedural vehicle in this situation is a motion for judgment.  See e.g.
Barr v. AAA Tex., LLC, No. 10-03-00243-CV, 2005 Tex. App. LEXIS 2248, **3-4
(Tex. App.—Waco Mar. 23, 2005, no pet. h.).  This is so because there is no
other factfinder to “instruct” regarding the verdict.





[2]           Texas courts have implicitly applied
this principle in protective order cases but, with the exception of Pena,
only in unpublished memorandum opinions.  See e.g. Siegert v. Flannery,
No. 04-03-00487-CV, 2004 Tex. App. LEXIS 6989, **2-6 (Tex. App.—San Antonio Aug. 4, 2004, no pet.) (mem. op.); Colvin v. Colvin, No. 03-03-00234-CV,
2004 Tex. App. LEXIS 3534, **18-21 (Tex. App.—Austin Apr. 22, 2004, no pet.)
(mem. op.).  








'> 

            If the arbitration clause is
enforceable under the FAA, an analysis of enforceability under the TAA is
unnecessary.  See In re D. Wilson Constr. Co., 196 S.W.3d 774,
783-84 (Tex. 2006).  Accordingly, we first review the petition for writ of
mandamus to assess enforceability of the arbitration provision under the FAA.

            The FAA applies to "any maritime
transaction or a contract evidencing a transaction involving commerce."  See
9 U.S.C. § 2.  "'[C]ommerce' . . . means commerce among the several
States."  9 U.S.C. § 1.  Interstate commerce is not limited to the
interstate shipment of goods, but includes all contracts "relating
to" interstate commerce.  In re FirstMerit Bank, N.A., 52 S.W.3d
749, 754 (Tex. 2001).  The FAA "extends to any contract affecting
commerce, as far as the Commerce Clause of the United States Constitution will
reach."  L & L Kempwood Assocs., L.P. v. Omega Builders, Inc. (In
re L & L Kempwood Assocs., L.P.), 9 S.W.3d 125, 127 (Tex. 1999) (per
curiam). 

            Bryan alleged in his first amended
petition that Matlack was a resident of California.  He also alleged that the
company, Matlack/Van Every Design, Inc. was a California company.  Bryan alleged that both Matlack and the company conducted business in Texas but did not
have a principle office in Texas and did not have a registered agent listed
with the Secretary of State.  Service of process was to be effectuated by serving
Matlack at her business address in Santa Cruz, California.  

            Bryan further alleged that in May of
2004 he met Matlack while attending an orthodontist meeting in Florida.  Matlack informed Bryan that she was an interior designer, specializing in the design
of dental offices.  Matlack eventually traveled to Texas to meet with Bryan to discuss designing a new office for Bryan in Huntsville, Texas.  Bryan approved a
contract submitted by Matlack.  The letterhead of the contract, which was
admitted into evidence at the hearing on LDF’s and Todd’s motions to compel
arbitration, indicated that Matlack’s business address was Santa Cruz, California.  According to Bryan, Matlack then sent design plans to Bryan for his approval
and eventually, a plan was approved.

            There was no other evidence about the
nature of the contract or services or source of supplies.  This is, however, a
commercial construction contract, and there was no effort to show that the
materials were of a uniquely local origin.  Even if the materials were of such
a nature, there is still an impact on interstate commerce.  See The
Daniel Ball, 77 U.S. 557, 565, 19 L. Ed. 999, 10 Wall. 557 (1870) (although
goods loaded and unloaded within the same state, interstate commerce was
impacted because some goods were destined to other states).  Further, Bryan does not contend that the FAA does not apply.  Accordingly, we hold that the FAA,
not the TAA, applies.

LDF and Foster

 

            In evaluating LDF’s motion to compel
arbitration, we first determine whether LDF proved a valid arbitration
agreement exists.  An agreement to arbitrate is valid except on grounds as
exist at law or in equity to revoke any contract. 9 U.S.C. § 2; see In
re Morgan Stanley & Co., 293 S.W.3d 182, 184 (Tex. 2009).  LDF
introduced its contract and arbitration provision into evidence at the hearing
on its motion to compel arbitration.  The provision states that “[a]ny claim
arising out of or related to the Contract…is subject to arbitration.”  Bryan’s only dispute with the validity of the provision, both to the trial court and on
appeal, is that the entire contract was procured by fraud.  As discussed more
fully below, this is not a specific challenge to the validity of the
arbitration provision but is a challenge to the validity of the contract as a
whole and such is left to resolution by the arbitrator.  See Buckeye
Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444-446, 126 S. Ct. 1204, 163 L. Ed. 2d 1038 (2006).  There was no challenge to the validity solely of
the arbitration provision in the contract, and LDF thus satisfied the first
step.  

            Next, we determine whether the claims
raised by Bryan fall within the scope of the arbitration provision.  When
addressing this issue, we focus on the factual allegations involved in the
dispute and not on the legal causes of action raised by the parties.  In re
Conseco Fin. Servicing Corp., 19 S.W.3d 562, 568 (Tex. App.—Waco 2000,
orig. proceeding).  Any doubts as to whether the dispute falls within the scope
of the arbitration agreement should be resolved in favor of arbitration.  Id. (citing Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62 & n.8, 115 S. Ct. 1212, 131 L. Ed. 2d 76 (1995)).

            Bryan pled many causes of action
against LDF and Foster:  breach of contract, breach of implied warranty and
workmanlike performance, negligence, and various claims of fraud.  After
securing designs and plans from Matlack and Todd, Bryan contracted with LDF to
construct a new office.  The contract included Todd’s and Matlack’s work.  LDF
was to finish the office within 210 days and “execute the Work described in the
Contract Documents.”  The contract also listed Todd as the architect overseeing
the project.  Bryan alleged LDF knew the provisions in the contract relating to
the architect would not be followed.  

            Construction of the office did not go
well.  There were problems with the foundation, patient chairs were not
centered with the windows, electrical panels and conduit had to be moved, and
weeks of inactivity occurred at the jobsite.  When it came time to install the
sheetrock, Bryan began to question the ceiling heights.  Bryan alleges he
received either unintelligible answers or no answer at all from LDF, Matlack,
and Todd.  LDF, Matlack, and Todd eventually acknowledged that the ceiling
heights could be altered but for an additional cost.

            Bryan alleged that LDF, Todd, and
Matlack were aware of the problems with the ceiling height and discussed among
themselves ways to “cover-up” and fix the problems, rather than informing Bryan of the problems.  Bryan also alleged that LDF, Todd, and Matlack held themselves out
to be professionals who where competent and experienced.  Bryan claimed that
LDF, Todd, and Matlack contracted with him “to provide services that would
facilitate, correspond, and accentuate the endeavors contractually and
voluntarily undertaken by the other defendants” according to a specific scheme
and design approved by Bryan.  

            Bryan further alleged that LDF, Todd,
and Matlack failed with regard to workmanship and integrity of the work
undertaken by them.  It was alleged that Todd and Matlack prepared inaccurate,
incompatible plans while LDF, who had a duty to ensure that construction was
conducted in accordance with the plans, did not inform Bryan of the problems
with the plans upon LDF’s discovery of the problems.  Furthermore, Bryan alleged, LDF performed services in an unacceptable and unworkmanlike manner in that
among other things, deviations from the plans were made without informing Bryan.

            Bryan added a claim to his first
amended petition regarding a bill from a sub-contractor for carpentry work. 
Rough carpentry work was completed in October of 2007.  According to Bryan,
copies of Applications and Certificates for Payment, which were sworn to by LDF
for the months of September and October, indicated that no money was owed
regarding the carpentry.  Bryan claimed that upon closer inspection, the
certificates were inaccurate and that LDF knew they were inaccurate.  Bryan alleged that LDF provided the bill to the subcontractor who signed it and sent it on
to Bryan.  Bryan further alleged that LDF used this bill to cause Bryan financial injury, mental anguish, and emotional distress. 

            All of Bryan’s claims center on the
construction of Bryan’s office and the failures of the office’s construction to
comply with Bryan’s contract.  The language of the arbitration provision is
very broad and encompasses any claim “arising out of or related to” the
contract.  There is no claim by Bryan that does not have its origin outside the
relationship created by the contract.[2]  Even Bryan’s tort claims arise from the relationship around the contract.  Likewise, Bryan’s
claims in his personal capacity (non-signatory) against Foster in his
individual capacity (non-signatory) all arise out of that same relationship,
the one created by the contract, and but for the contract would not exist.  In
re Conseco Fin. Servicing Corp., 19 S.W.3d 562, 570 (Tex. App.—Waco 2000,
orig. proceeding).  Finally, we note that there is no suggestion that Foster’s
actions were in any capacity other than as an agent for LDF.

            Accordingly, we hold that all claims
against LDF, including those that are made against Foster, are within the scope
of the arbitration agreement.

Defenses

            Having determined that LDF proved the
existence of an arbitration agreement between the parties and that the claims
asserted by Bryan are within the scope of the arbitration agreement, we now
turn to the defenses to arbitration raised by Bryan and which appear to have
been relied upon by the trial court.  The primary defense is that the
construction agreement, including the arbitration agreement, was induced by
fraud.  This is a defense to the entire contract.  This is not just a defense
to the mandatory arbitration provision.  A plaintiff cannot sue for the
benefits on the contract, in essence sue for breach of contact, and sue on only
part of the contract.  See In re FirstMerit Bank, N.A., 52 S.W.3d
749, 755 (Tex. 2001) (“[A] litigant who sues based on a contract subjects him
or herself to the contract's terms.”).  Having brought the suit as a breach of
contract claim, a plaintiff cannot excise a single paragraph from the contract,
the arbitration clause, and reject it.  See In re Weekley Homes, L.P.,
180 S.W.3d 127, 133 (Tex. 2005) (“Having obtained these substantial actions
from Weekley by demanding compliance with the provisions of the contract, Von
Bergen cannot equitably object to the arbitration clause attached to them.”).  Bryan is not asserting that the fraud/unconsionablilty claim goes to only the arbitration
clause.  Since the claim is asserted to the contract as a whole, it is a claim
that is decided by the arbitrator, rather than the court.  See In re
Morgan Stanley & Co., 293 S.W.3d 182, 185 (Tex. 2009).

            Bryan also asserts that LDF cannot
avail itself of the arbitration provision because of conditions precedent to
enforcement that were not, and cannot now be, performed.  The provision states
that prior to arbitration, the parties will attempt to resolve the dispute,
first through the architect and then through nonbinding mediation.[3]  Bryan asserts that because
these provisions are conditions precedent to the institution of litigation and
cannot be complied with, the arbitration provision is negated.  We disagree. 
There is no indication in the provision that the parties intended to dispense
with arbitration if the other methods of resolution did not occur first.  In
re U.S. Home Corp., 236 S.W.3d 761, 764 (Tex. 2007).  Further, Bryan cannot unilaterally skip the efforts to resolve the dispute by other methods by
skipping directly to litigation and thereby avoid the arbitration provision.  Cf.
Global Evangelism Educ. Ministries, Inc. v. Caddell, No. 04-08-00686-CV, 2009 Tex. App. LEXIS 1085, *5-6 (Tex. App.—San Antonio Feb. 18, 2009, no pet.) (mem. op.) (party that first filed suit rather than seeking
mediation cannot rely on the failure of conditions precedent to evade
arbitration).  To hold otherwise would allow the provision to be avoided simply
because one party chose to go directly to litigation.  The agreement provided
for three levels of dispute resolution before enforcement in the courts. 
Because this is an issue to be decided by the arbitrator,[4] the arbitrator may decide that the methods
of dispute resolution skipped by Bryan need to be utilized before proceeding to
arbitration; or the arbitrator may decide that at this point the other methods
of dispute resolution would be ineffective and, therefore, proceed with the
resolution of the disputes by arbitration.

            Bryan also asserts that LDF cannot
avail itself of the arbitration provision in Matlack’s contract.  In this
regard, Bryan argues that because LDF comes to court with unclean hands, LDF
cannot use a mandamus proceeding to compel arbitration as a non-signatory under
another party’s agreement.  Because of our holdings above, we are not utilizing
the arbitration provision in Matlack’s agreement but rather we are using the
provision in LDF’s own contract to compel arbitration of all claims Bryan has asserted against all the LDF related defendants.

            Accordingly, because Bryan has failed
to prove any valid reason why their claims against LDF should not be referred
to binding arbitration, we conditionally grant LDF’s petition for writ of
mandamus.  

Todd

            We now turn to the trial court’s
denial of Todd’s motion to also refer Bryan’s claims against Todd to
arbitration.  Todd had a written contract with Bryan but that contract did not
have an arbitration provision in it.  Thus, Todd is a non-signatory to any
arbitration agreement.  Bryan asserts that the trial court, having reviewed the
evidence, did not abuse its discretion in refusing to refer the claims raised
against Todd to arbitration.  We disagree.

            As a rule, arbitration of a claim
cannot be compelled unless it falls within the scope of a valid arbitration
agreement; but sometimes a person who is not a party to the agreement can
compel arbitration with one who is, and vice versa.  Meyer v. WMCO-GP, LLC,
211 S.W.3d 302, 305 (Tex. 2006).  Non-signatories to an agreement subject to
the FAA may be bound to an arbitration clause when rules of law or equity would
bind them to the contract generally.  In re Labatt Food Serv., 279
S.W.3d at 643; In re Weekley Homes, 180 S.W.3d at 131.  Several rules of
law and equity, such as the principles of equitable estoppel and agency, may be
used to compel arbitration.  See In re Labatt Food Serv., 279
S.W.3d at 644; see also Grigson v. Creative Artists Agency, L.L.C.,
210 F.3d 524, 527 (5th Cir. 2000).  

            Equitable estoppel applies to allow a
non-signatory to compel arbitration when the signatory to a written agreement
containing an arbitration clause must rely on the terms of the written
agreement in asserting its claims against the non-signatory.  Grigson v.
Creative Artists Agency, L.L.C., 210 F.3d 524 (5th Cir. Tex. 2000).  When a
signatory's claims against a non-signatory make reference to or presume the
existence of the written agreement, the signatory's claims arise out of and
relate directly to the written agreement, and arbitration is appropriate.  Id.; Meyer v. WMCO-GP, LLC, 211 S.W.3d 302, 307 (Tex. 2006).  The Fifth
Circuit refers to this as the “intertwined-claims test.”  Grigson, 210
F.3d at 527.  The Texas Supreme Court has referred to this principal as “direct
benefits” estoppel.  See Meyer, 211 S.W.3d at 305 (“a person who
seeks by his claim ‘to derive a direct benefit from the contract
containing the arbitration provision’ may be equitably estopped from refusing
arbitration.” (emphasis added)).  

            Todd asserts that Bryan is equitably
estopped from preventing arbitration of the claims asserted against them.  As
with LDF, Bryan alleged various claims against Todd:  breach of contract,
breach of implied warranty and workmanlike performance, negligence, DTPA, and
various claims of fraud.  According to the first amended petition, Bryan began searching for an architect in 2004 to design his office based upon the design,
interior details, and overall schematics supplied by Matlack.  Bryan ultimately contracted with Todd.  Bryan’s contract with Todd provided that Todd would
devise a set of master and schematic plans to be designed according to the
plans and specifications provided by Matlack.  Matlack sent plans to Bryan for approval.  Todd was to design the appropriate plans to the approved
specifications set out by Matlack.  Todd drafted approximately 60 pages of
intricate drawings, design diagrams, roof plans, ceiling plans, etc.  

            Thus far, the allegations in this
section are those essentially unique to Todd or that relate to Todd and
Matlack.  Previously, we have discussed in detail, for the purpose of
addressing the scope of LDF’s arbitration provision, the allegations made
against LDF.  It is now necessary to repeat many of those same allegations. 
However, this time, the purpose of this review of the allegations is to show
how interrelated Bryan’s allegations against LDF, Todd, and Matlack are and
thus how impractical it would be to try to resolve the allegations against LDF
and Matlack in one forum and those against Todd in another.

            In 2007, LDF contracted with Bryan to construct the new building.  The contract included Todd’s and Matlack’s work. 
LDF was to finish the building within 210 days and “execute the Work described
in the Contract Documents.”  The contract also listed Todd as the architect overseeing
the project.  Bryan alleged that LDF knew the provisions in the contract
relating to the architect would not be followed.  

            As previously described, construction
of the office did not go well.  When it came time to install the sheetrock,
Bryan began to question the ceiling heights.  Bryan alleged he received either
unintelligible answers or no answer at all from LDF, Matlack, and Todd.  LDF,
Matlack, and Todd eventually acknowledged that the ceiling heights could be
altered but for an additional cost.  As construction problems mounted, Bryan began to investigate the cause.

            After a review of the plans, Bryan learned that the plans of Todd and Matlack were incompatible and that Todd’s plans
did not incorporate Matlack’s designs.  Bryan alleges that LDF, Todd, and
Matlack were aware of the problems and discussed among themselves ways to
“cover-up” and fix the problems, rather than informing Bryan of the problems. 
LDF, Todd, and Matlack, Bryan alleged, held themselves out to be professionals
who where competent and experienced.  Bryan claimed that LDF, Todd, and Matlack
contracted with him “to provide services that would facilitate, correspond, and
accentuate the endeavors contractually and voluntarily undertaken by the other
defendants” according to a specific scheme and design approved by Bryan.  

            Bryan further alleged that LDF, Todd,
and Matlack failed with regard to workmanship and integrity of the work
undertaken by them.  Todd and Matlack prepared inaccurate, incompatible plans
while LDF, who had a duty to ensure that construction was conducted in
accordance with the plans, did not inform Bryan of the problems with the plans
upon LDF’s discovery of the problems.  Furthermore, Bryan alleged, LDF
performed services in an unacceptable and unworkmanlike manner in that among
other things, deviations from the plans were made without informing Bryan.

            In this instance, the claims against
Todd are so intertwined and interdependent with the claims against LDF and
Matlack, both of which have arbitration provisions in their contracts with Bryan, that it would be impractical to resolve the disputes against them in arbitration
without simultaneously resolving the claims against Todd.  

Defenses

            Bryan asserts that Todd cannot assert
equitable estoppel to compel Bryan to arbitration because Todd has unclean
hands.  Bryan relies upon the principle in law that he who seeks equity must do
equity.  See Truly v. Austin, 744 S.W.2d 934, 938 (Tex. 1988) (“It is well-settled that a party seeking an equitable remedy must do equity and
come to court with clean hands.”).  A party seeking to invoke this equitable
doctrine must show that he has been seriously harmed and the wrong complained
of cannot be corrected without applying the doctrine.  City of Fredericksburg v. Bopp, 126 S.W.3d 218, 221 (Tex. App.—San Antonio 2003, no pet.).  Bryan asserts that at the hearing he proved Todd did not come to court with “clean
hands.”  Specifically, Bryan argues that Todd’s attorney admitted that there
was a discrepancy in the ceiling height.  Further, he argues that in an email
presented at the hearing, LDF knew of the discrepancies and sent nineteen
“requests for information” to Todd requesting information from Todd on how to
proceed.  According to the email, Todd told LDF how to proceed regarding the
ceiling height discrepancies. 

            Todd and LDF assert that Bryan did not present any evidence of “unclean hands” at the hearing.  Specifically, Todd
and LDF assert that this Court cannot rely on the email because it was not
properly introduced into evidence at the hearing.  We need not resolve whether
trial counsel’s references to documents not otherwise introduced into evidence
was evidence properly before the trial court.  Even if we consider the email
and argument of counsel as evidence regarding the conduct of Todd, it would
only go so show a possible breach of the contract and is not of the character
of evidence that shows “unclean hands” such as to defeat the application of the
doctrine of collateral estoppel to compel Bryan to arbitrate the claims against
the non-signatory to the arbitration agreement, Todd, along with the claims
that are subject to arbitration against LDF and Matlack.

            Bryan also argues that the trial court
had discretion not to apply equitable estoppel, even if it could be applied in
the same circumstances.  We disagree.  "A trial court has no 'discretion'
in determining what the law is or applying the law to the facts." 

Meyer v. WMCO-GP, LLC, 211 S.W.3d 302, 308 (Tex. 2006) (quoting, Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992)).

            Accordingly, we hold that Bryan’s
claims against Todd should also have been referred to arbitration and
conditionally grant Todd’s petition for writ of mandamus.

Matlack

 

            Finally, we note that the trial court
withdrew its order which referred the claims against Matlack to arbitration,
holding that the order was rendered without adequate notice to Bryan.  Bryan conceded in his brief filed with this Court that he does not contest the
validity of the Matlack arbitration agreement.  Matlack filed amicus briefs
with this Court in these proceedings in support of having all the claims of Bryan against all the defendants referred to arbitration together.  We have no reason to
believe that the trial court will not grant Matlack’s pending motion to refer Bryan’s claims against Matlack to arbitration, especially in light of the discussion and
holdings herein.  Because the trial court has not ruled on Matlack’s pending
motion, because we have no proceeding before us which addresses that motion,
and further because we cannot compel the trial court to rule on the motion in a
certain way, we decline at this time to mandate the trial court’s ruling on
that motion.  See In re Salazar, 134 S.W.3d 357, 358 (Tex. App.—Waco 2003, orig. proceeding); see also State ex rel. Curry v. Gray,
726 S.W.2d 125, 128 (Tex. Crim. App. 1987).

Conclusion 

 

            In summary, we conditionally grant
LDF’s and Todd’s petitions for writ of mandamus.  A writ will issue only if the
trial court fails to withdraw its order denying the abatement of the trial
court proceedings and the referral of Bryan’s claims against LDF and Todd to
binding arbitration within 21 days from the date of this opinion.  Further, the
appeal by LDF and Todd is dismissed.

 

 

                                                                        TOM
GRAY

                                                                        Chief
Justice

 

Before
Chief Justice Gray,

            Justice
Reyna, and

            Justice
Davis                                                             

Appeal
dismissed

Petitions
conditionally granted

Opinion
delivered and filed March 10, 2010

[CV06]









[1] Bryan, in response to Todd’s and LDF’s petitions for writ of mandamus, conceded the
validity of the Matlack arbitration provision but, nevertheless, sued Matlack
along with Todd and LDF.





[2] The
only claim Bryan contends was outside the scope of the arbitration provision is
his claim pursuant to the fraudulent lien statute.  Tex. Civ. Prac. & Rem. Code § 12.002 (Vernon Supp. 2009). 
Nevertheless, this claim also falls within the scope of the arbitration
provision because, but for the contract with LDF, the subcontractor would not
have incurred costs of performing carpentry work for which he sought payment
from Bryan.  See In re Conseco Fin. Servicing Corp., 19 S.W.3d
562, 570 (Tex. App.—Waco 2000, orig. proceeding).  





[3] We
note that while these proceedings were pending, we abated the proceedings for
mediation.  A settlement was not reached.





[4] Howsam
v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84-85, 123 S. Ct. 588, 154 L.
Ed. 2d 491 (2002).