Opinion issued on February 9, 2006









     






In The
Court of Appeals
For The
First District of Texas




NOS. 01-05-00311-CV
          01-05-00312-CV




LASHONDA MONTRIE ROCHELLE, Appellant

V.

DEPARTMENT OF FAMILY & PROTECTIVE SERVICES, Appellee




On Appeal from 314th District Court 
Harris County, Texas
Trial Court Cause Nos. 2004–06028J and 2004–03043J




MEMORANDUM OPINION

          Following a bench trial, the trial court terminated the parental rights of
appellant, Lashonda Montrie Rochelle, to her five minor children, K.R., J.B., J.P.,
F.B., and A.B.


 Presenting four issues, appellant (1) challenges the legal and factual
sufficiency of the evidence to support a finding under Family Code subsection
161.001(1)(E) that appellant “engaged in conduct or knowingly placed [the children]
with persons who engaged in conduct which endangers the physical or emotional
well-being of [the children];”


 (2) contends that no evidence was presented to support
a finding that termination was in the children’s best interest; (3) asserts that her right
to due process was violated by the termination; and (4) contends that the trial court
erred when it named appellee, the Department of Protective and Family Services (“the
Department”), as the children’s sole managing conservator.
          We affirm. 
Background
          In 1997, appellant was 15 when she gave birth to her son, K.R. Another son,
J.B., was born in 2002, and a third, J.P., was born in 2003. Each of the children had
different fathers. None of the fathers lived with appellant and her children, nor did
they actively participate in the children’s lives.
          On March 26, 2004, the Department received a report that seven-year-old K.R.
had been abused by appellant. An investigator from the Department interviewed K.R.
at his school on March 29, 2004. K.R. told the investigator that appellant had hit him
on the back and in the face with a belt. The investigator observed that K.R. had new
injuries and old scars. The investigator noted that K.R. had bruising, belt marks on
his face, and marks on his back. K.R. later reported, during a videotaped interview,
that appellant had tied his hands behind his back with an extension cord and hit him
with a belt and had punched him in the head and in the stomach. K.R. also reported
that appellant had physically disciplined his two younger brothers, J.B. and J.P. 
          When the Department’s investigator interviewed appellant, she confirmed that
she had “whooped” K.R. with a belt several times, but had not checked to determine 
whether she had left any marks on him. Appellant denied physically disciplining J.B.
and J.P. 
          The Department determined that the three children were at risk of further injury
and removed them from appellant’s care. The Department was granted temporary
conservatorship of the children. In April 2004, the Department presented appellant
with a family service plan with the stated goal of family reunification. As part of the
service plan, appellant was required to complete parenting classes, to attend anger
management classes, to participate in individual therapy, to attend bimonthly visits
with her children, to obtain suitable housing, and maintain financial support for
herself and her children. 
          Because appellant was not able to provide the Department with the names of
any relatives who were suitable to care for the children, the three children were placed
together in a foster home. The foster mother soon discovered that K.R. had
behavioral problems. K.R. was disruptive in school and was diagnosed with mood
disorder, psychotic disorder, and attention deficit disorder, requiring K.R. to take four
different medications. K.R.’s behavioral issues resulted in three separate suspensions
from school and ultimately resulted in a hospitalization in September 2004. K.R.
continues to attend therapy every other week and sees a medical doctor every three
to four weeks. 
          On May 19, 2004, appellant gave birth two months prematurely to twins, F.B.
and A.B. The twins were born with a number of physical problems. F.B. was born
deaf in his left ear. A.B. is deaf in both ears. F.B. has a heart condition requiring him
to wear a heart monitor at night. The twins both suffer from acid reflux and take
medication for the condition. At times, A.B.’s acid reflux results in her not being able
to take a breath, requiring her to be visually monitored. A.B. has also been diagnosed
with microcephalus.


 The twins remained hospitalized for approximately two months
following their birth. After their release, the twins were also placed in foster care.
          In September 2004, the Department issued another family service plan,
changing its stated goal for the children from family reunification to adoption. At
that point, the Department sought to terminate appellant’s parental rights to her five
children. 
          After a two-day bench trial beginning on February 23, 2005, the trial court
orally found that appellant’s parental rights to her five children should be terminated
pursuant to Family Code section 161.001(1)(E), one of the grounds pled by the
Department, and that such termination was in the children’s best interest. The trial
court’s decrees terminating appellant’s parental rights each recited that the trial court
had found by clear and convincing evidence that appellant had “engaged in conduct
or knowingly placed the children with persons who engaged in conduct which
endangers the physical or emotional well-being of the children, pursuant to
§ 161.001(1)(E) of the Texas Family Code.” The decrees also recited that the trial
court had found by clear and convincing evidence that termination was in the
children’s best interest.


 No findings of fact or conclusions of law were requested or
filed. 
Sufficiency of the Evidence
A.      Burden of Proof and Standard of Review
          The burden of proof at trial in parental-termination cases is by clear and
convincing evidence. Tex. Fam. Code Ann. § 161.001 (Vernon Supp. 2005); In re
J.F.C., 96 S.W.3d 256, 263 (Tex. 2002). Section 161.001 of the Texas Family Code
provides the method by which a court may involuntarily terminate the parent–child
relationship. Tex. Fam. Code. Ann. § 161.001. Under this section, a court may
order the termination of the parent–child relationship if the court finds, by clear and
convincing evidence, that (1) one or more of the acts enumerated in subsection
161.001(1) was committed and (2) termination is in the best interest of the child. Id. 
“Clear and convincing evidence” means the measure or degree of proof that will
produce in the mind of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established. Tex. Fam. Code. Ann. § 101.007 (Vernon
2002); J.F.C., 96 S.W.3d at 264. This heightened burden of proof results in a
heightened standard of review.
          When determining legal sufficiency, we review all the evidence in the light
most favorable to the finding “to determine whether a reasonable trier of fact could
have formed a firm belief or conviction that its finding was true.” J.F.C., 96 S.W.3d
at 266. To give appropriate deference to the factfinder’s conclusions, we must
assume that the factfinder resolved disputed facts in favor of its finding if a
reasonable factfinder could do so. Id. We disregard all evidence that a reasonable
factfinder could have disbelieved or found to have been incredible. Id. This does not
mean that we must disregard all evidence that does not support the finding. Id. 
Disregarding undisputed facts that do not support the finding could skew the analysis
of whether there is clear and convincing evidence. Id. Therefore, in conducting a
legal-sufficiency review in a parental-termination case, we must consider all of the
evidence, not only that which favors the verdict. See City of Keller v. Wilson, 168
S.W.3d 802, 817 (Tex. 2005).
          In determining a factual-sufficiency point, the higher burden of proof in
termination cases also alters the appellate standard of review. In re C.H., 89 S.W.3d
17, 26 (Tex. 2002). “[A] finding that must be based on clear and convincing evidence
cannot be viewed on appeal the same as one that may be sustained on a mere
preponderance.” Id. at 25. In considering whether evidence rises to the level of being
clear and convincing, we must consider whether the evidence is sufficient to produce
in the mind of the factfinder a firm belief or conviction as to the truth of the allegation
sought to be established. Id. We consider whether disputed evidence is such that a
reasonable factfinder could not have resolved that disputed evidence in favor of its
finding. J.F.C., 96 S.W.3d at 266. “If, in light of the entire record, the disputed
evidence that a reasonable factfinder could not have credited in favor of the finding
is so significant that a factfinder could not reasonably have formed a firm belief or
conviction, then the evidence is factually insufficient.” Id.
          The natural rights that exist between parents and their children are of
constitutional dimension. Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). 
Therefore, termination proceedings should be strictly scrutinized, and the involuntary
termination statutes should be strictly construed in favor of the parent. Id. at 20–21. 
However, “[j]ust as it is imperative for courts to recognize the constitutional
underpinnings of the parent-child relationship, it is also essential that emotional and
physical interests of the child not be sacrificed merely to preserve that right.” C.H.,
89 S.W.3d at 26.
B.      Endangerment Through Course of Conduct: Section 161.001(1)(E)
          As mentioned, one of the grounds pled by the Department for terminating
appellant’s parental rights was Family Code subsection 161.001(1)(E). This
subsection provides that a court may terminate the parent-child relationship if the
court finds by clear and convincing evidence that the parent has engaged in conduct
or knowingly placed the child with persons who engaged in conduct that endangers
the physical or emotional well-being of the child. Tex. Fam. Code Ann. §
161.001(1)(E). In issues one and two, appellant challenges the legal and factual
sufficiency of the evidence to support such a conclusion. 
          Within the context of subsection 161.001(1)(E), “endanger” means to expose
a child to loss or injury or to jeopardize a child’s emotional or physical health. Tex.
Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). The danger to a
child must arise solely from the parent’s conduct as established by the parent’s
actions or by the parent’s failure to act. See Robinson v. Tex. Dep’t of Protective &
Regulatory Servs., 89 S.W.3d 679, 688 (Tex. App.—Houston [1st Dist.] 2002, no
pet.). Although “endanger” means more than a “threat of metaphysical injury or the
ill effects of a dysfunctional family,” it does not require that the conduct be actually
directed at a child or that a child suffer an actual injury. Boyd, 727 S.W.2d at 533. 
That is, the conduct does not have to constitute a concrete threat of injury to the child. 
In re M.J.M.L., 31 S.W.3d 347, 350 (Tex. App.—San Antonio 2000, pet. denied). 
The conduct does not have to occur in the presence of the child. Director of Dallas
County Child Protective Servs. v. Bowling, 833 S.W.2d 730, 733 (Tex. App.—Dallas
1992, no writ). And the conduct may occur before the child’s birth and both before
and after the child has been removed by the Department. In re S.M.L.D., 150 S.W.3d
754, 757–58 (Tex. App.—Amarillo 2004, no pet.). 
          Termination under subsection 161.001(1)(E) typically requires evidence of
more than a single act or omission. In re D .T., 34 S.W.3d 625, 634 (Tex. App.—Fort
Worth 2000, pet. denied). Endangerment may be satisfied by showing that a parent
engaged in a “course of conduct” that endangered the child’s physical or emotional
well-being. In re U.P., 105 S.W.3d 222, 233 (Tex. App.—Houston [14th Dist.] 2003,
pet. denied).
          Appellant suggests that the verdict in this case is based on “hearsay, rank
speculation, legal conclusion, and assertion,” without legally sufficient proof. 
Appellant attacks as conclusory the testimony of the case worker and the ad litem,
who each testified that appellant’s parental rights should be terminated. Appellant
also contends that “the single act for which all 5 of Appellant’s children were taken
from her involved the ‘whoppin’ Appellant gave to her eldest child [K.R.] when,
according to Appellant, he disobeyed her.” 
          We disagree with appellant’s characterization of the record. Contrary to
appellant’s assertions, the following evidence supports a finding that appellant
engaged in a course of conduct that endangered the physical or emotional well-being
of her children:
 
•        The Department’s investigator testified that K.R. told him that appellant had 
hit him on the back and on the face with a belt. The investigator also testified
that both old and new injuries were apparent on K.R. The investigator stated
that he saw belt marks on K.R.’s back and face and that he also observed
bruising on K.R.
 
•        In the videotaped interview, K.R. described separate instances of appellant’s
“whooping” him with a belt. K.R. described that, following one, he was left
with dried blood on his head. K.R. also related how appellant had made him
lie on his stomach, tied his hands behind his back with an extension cord, and
then hit him with a belt. When the interviewer asked him how many times
appellant had hit him with a belt, K.R. said, “1000 times.” According to K.R.,
appellant “whooped” him every day. K.R. told the interviewer that appellant
had on two occasions punched him in the head and in the back. He also stated
that appellant had slapped him, resulting in a nose bleed. K.R. told the
interviewer that appellant had slapped two-year-old J.B. in the face and in the
process had scratched J.B. with her fingernail. K.R. said that appellant also
slapped 10-month-old J.P. on the leg. When asked, K.R confirmed that he was
afraid of appellant. On the videotape, the interviewer pointed out several
marks and bruises on K.R.’s body, which K.R. attributed to appellant.
 
•        K.R.’s foster mother testified that K.R. told her that appellant had tied him up
and indicated that appellant had hit him with a garden hose.
 
•        In a psychological evaluation of appellant, the psychologist wrote that
“[appellant’s] parenting style will tend to be controlling and demanding. She
may fail to understand the developmental needs of her children and will look
to them for comfort and assurance.” The psychologist concluded that “[t]his
role reversal may cause her to take their misbehavior more personally as if they
are failing to take care of her by making things difficult.”
 
•        The Department’s caseworker assigned to the five children, Christine Wagner,
testified that, when appellant gave birth to the twins, the doctors at the hospital
told Wagner that appellant had waited until three days after her membranes had
ruptured to come to the hospital. Wagner testified that she was told that
appellant was dilated 10 centimeters and that the twins were in such distress
that an emergency caesarean section had to be performed.
 
•        During trial, appellant acknowledged that she had virtually no pre-natal care
during her pregnancy with the twins, admitting that she had gone to only one
doctor’s visit two months before the twins’ birth to confirm that she was
pregnant. 
 
•        In the psychological evaluation of appellant, the psychologist wrote, “It seems
odd that [appellant] did not make the effort to get prenatal care for any of her
pregnancies. She seemed to push this aside easily when she spoke to 4Cs by
saying that she did not want to mess with the paperwork. She said that she was
‘just too lazy.’” The psychologist further wrote that she was “concerned that
this suggests some serious neglect on [appellant’s] part and a lack of caring for
her unborn children and perhaps a lack of bonding to them.” 
 
•        The twins’ foster mother testified regarding the infants’ physical problems and
described the high degree of vigilance and attention required on a daily basis
to care for the twins. The foster mother described the training that she had to
undergo to learn how to care for the twins. She testified that she spent three
days at the hospital learning how to feed the twins and that she also stayed
overnight at the hospital as part of her training. 
 
•        Appellant testified that, with regard to learning how to care for her twins, she 
“did a class once with a lady that [sic] had a premature son and it was only for
a [sic] hour.” Appellant testified that she did not realize that F.B. had a heart
condition until two months after his birth. She did not know that the twins had
a problem with reflux until one of her visitations with them. Appellant
admitted that, because she had not taken the appropriate training, she would
not know “the correct procedure” to follow if one of the twins spit up. In fact,
the twins’ foster mother testified that, during a visitation with appellant, A.B.
had a “spit attack” and that appellant did not know how to handle it.
          It is pertinent to this case that the manner in which a parent treats other children
in the family can be considered in deciding whether that parent engaged in a course
of conduct that endangered the physical or emotional well-being of a child. See, e.g.,
In re D.L.N., 958 S.W.2d 934, 939 (Tex. App.—Waco 1997, pet. denied) (concluding
that jurors could consider evidence showing how parent treated child’s two sisters in
deciding if parent engaged in course of conduct that endangered physical or
emotional well-being of subject child), disapproved on grounds by J.F.C., 96 S.W.3d
at 267, and C.H., 89 S.W.3d at 26. This is true even though the cited conduct
occurred before the birth of the subject child. See, e.g., Navarrette v. Tex. Dep’t of
Human Resources, 669 S.W.2d 849, 850 (Tex. App.—El Paso 1984, no writ)
(upholding termination of parental rights over child taken into custody from hospital
after birth, even though child was not subjected to deplorable living conditions of six
siblings). From appellant’s abuse of K.R., the trial court, as factfinder, could have
inferred that J.B. and J.P. were treated similarly and that all four children would face
this type of treatment in the future if placed in appellant’s care. See D.L.N., 958
S.W.2d at 939 (“From Bowden’s neglect of her other two children who lived with her,
the jury could infer that D.L.N. was similarly treated before she came to live with the
Dotsons, while visiting with Bowden, and that D.L.N. would face this type of
treatment in the future if returned to Bowden’s care.”); see also In re T.L.S., 170
S.W.3d 164, 166 (Tex. App.—Waco 2005, no pet.) (recognizing that “[d]uring the
last decade, a principle has emerged in parental termination and child custody cases
which recognizes that evidence that a parent has engaged in abusive or neglectful
conduct in the past permits an inference that the parent will continue this behavior in
the future.”). 
          We recognize that not all of the above-listed evidence is undisputed. At trial,
appellant denied not only that she had intentionally hit K.R. in the face or physically
abused him to the degree that he described, but also denied physically disciplining
either J.B. or J.P. Appellant also testified that she believed that her behavior could
be “corrected.” When asked what she would do differently, appellant stated that she
would not yell at or spank the children, but would try to communicate with them. 
          Maintaining our assigned constitutional role, we recognize that it was the trial
court’s role as factfinder to judge the credibility of the witnesses in this case, not ours. 
As such, it was the trial court’s prerogative to believe K.R. and to disbelieve
appellant. Nothing in the record renders K.R.’s accusations inherently incredible. To
the contrary, K.R.’s claims of abuse are supported by the old and new marks visible
on his body at the time of the interview. Similarly, the trial court could have
disbelieved appellant’s claim that she would change her behavior. The psychologist’s
evaluation also illuminates appellant’s testimony. The psychologist observed that
appellant “tends to portray herself as being exceptionally free of shortcomings to
which most individuals will admit” and that appellant “may be blindly uncritical of
her own behavior tending to minimize the negative impact of her behavior has on
others . . . .”
          As previously detailed, the evidence also showed that appellant waited three
days to go to the hospital after her water broke to deliver the twins. At that point, the
twins were in distress and an emergency caesarean section was performed. The
evidence also shows that appellant had received almost no pre-natal care during her
pregnancy.


 Appellant points out that no evidence was presented indicating that her
failure to obtain pre-natal care or her waiting for three days to go to the hospital
resulted in either the twins’ premature birth or their physical problems following
birth. 
          Nevertheless, for parental conduct to constitute endangerment of a child’s
well-being, it is not necessary that the conduct be directed at the child or that the child
actually suffer injury; rather, it is sufficient that the child’s well-being be jeopardized
or exposed to loss or injury. Boyd, 727 S.W.2d at 533. The specific danger to the
child’s well-being need not be established as an independent proposition, but may
instead be inferred from parental misconduct. Id. A showing of a causal connection
between the parent’s conduct and any resultant injury or adverse effect to the child
is not required. Id.; see In re W.A.B., 979 S.W.2d 804, 807 (Tex. App.—Houston
[14th Dist.] 1998, pet. denied) (concluding that subsection 161.001(1)(E) does not
require causal connection between parent’s misconduct and actual harm to child
resulting from that misconduct; noting that “endanger” has been interpreted by Texas
Supreme Court to mean to expose to loss or injury or to jeopardize); In re R.D., 955
S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied) (recognizing that
subsection 161.001(1)(E) does not require showing that parental conduct caused
actual injury to child). Thus, even though no causal connection was established
between appellant’s actions and an actual injury to the twins, the trial court could
have inferred that appellant’s conduct exposed the twins to injury and placed them
in jeopardy, i.e. endangered the twins’ physical well-being. The trial court could have
further reasoned that, if they were placed in appellant’s care, the twins’ physical and
emotional welfare would be at risk, given their special needs. The trial court also
could have reasonably inferred that such conduct shows a lack of concern for the
children and a lack of judgment that could place all five children in jeopardy for
neglect and abuse.
          Such inferences are further supported by appellant’s conduct following the
twins’ birth. During the twins’ two-month hospitalization, appellant testified that she
visited the twins three times a week during the first month and visited them only once
in the second month. Appellant attributed her lack of visitation to her work schedule. 
At no time before trial, which was nine months after the twins were born, had
appellant obtained the training necessary to care for her twins’ special medical needs. 
Appellant’s conduct relating to the twins’ birth and in the months that followed
occurred at a time when she knew that she was at risk of losing her parental rights to
her three older children. 
          We note that evidence was presented indicating that appellant had completed
many of the requirements of the family service plan. Appellant took the required
parenting and anger management classes, went to all the bimonthly visitations with
her children, and underwent the required psychological evaluation. Appellant was
also enrolled in a business school and testified that she expected to be placed in a
position upon the program’s completion. However, the evidence also indicated that
appellant had not complied with other requirements. For example, appellant did not
pay the $25 per-month child support that she was required to pay while the children
were in foster care and did not maintain consistent employment. 
          We conclude that the evidence, viewed in the light most favorable to a finding
of endangerment, was sufficiently clear and convincing such that a reasonable
factfinder could have formed a firm belief or conviction that appellant engaged in
conduct that endangered the children’s physical or emotional welfare. Although
some conflicting evidence was presented, such evidence was not so significant that
a reasonable trier of fact could not have reconciled such evidence in favor of its
finding and formed a firm belief or conviction that appellant engaged in conduct that
endangered the children’s physical or emotional welfare. Accordingly, we hold that
the evidence was legally and factually sufficient to support an endangerment finding.
C.      Best Interest of the Children
          Appellant also challenges the legal sufficiency of the evidence to support the
trial court’s required finding that termination would be in the children’s best interest. 
See Tex. Fam. Code Ann. § 161.001(2) (Vernon Supp. 2005). As worded,
appellant’s issue does not challenge the factual sufficiency of the evidence to support
a finding that termination was in the children’s best interest. Appellant contends, 
Other than self-serving testimony of the caseworker and the guardian ad
litem, there is no evidence offered by the State that termination was in
the best interest of each and every one of Appellant’s children. [The
Department] failed to put forth credible evidence regarding how
termination of Appellant’s parental rights would be in the best interest
of each of appellant’s children.

          Some of the factors that an appellate court may consider in ascertaining the best
interest of a child include the non-exhaustive list set forth in Holley v. Adams. 544
S.W.2d 367, 371–72 (Tex. 1976). Those factors include the following: (1) the desires
of the child; (2) the emotional and physical needs of the child now and in the future;
(3) the emotional and physical danger to the child now and in the future; (4) the
parental abilities of the individuals seeking custody; (5) the programs available to
assist these individuals to promote the best interest of the child; (6) the plans for the
child by these individuals or by the agency seeking custody; (7) the stability of the
home or proposed placement; (8) the acts or omissions of the parent that may indicate
that the existing parent-child relationship is not a proper one; and (9) any excuse for
the acts or omissions of the parent. Id. 
          These factors are not exhaustive. C.H., 89 S.W.3d at 27. The absence of
evidence about some of these factors does not preclude a factfinder from reasonably
forming a strong conviction or belief that termination is in the child’s best interest. 
Id. “Best interest” does not require proof of any unique set of factors, nor does it
limit proof to any specific factors. Holley, 544 S.W.2d at 371–72. With the
foregoing legal precepts in mind, we review the legal sufficiency of the evidence to
support the trial court’s finding that termination was in the children’s best interest. 
          The Department relies on appellant’s history of physical abuse toward the three
oldest children, particularly K.R., to support the trial court’s best-interest finding. We
agree that such evidence is relevant not only to support the trial court’s endangerment
finding, but also to support the best-interest determination. See C.H., 89 S.W.3d at
28; In re D.M., 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). We also
review the evidence as it relates to the Holley factors.
          The evidence showed that the children were not bonded with appellant. K.R.
told the Department’s interviewer that he was afraid of appellant. K.R. also
expressed that he did not want to visit appellant. During the visits, K.R. would draw
or read books. After the visits, K.R. would be angry. At the time of trial, K.R. no
longer visited with his mother based on his therapist’s recommendation. 
          During the visits, J.B. would try to leave the room and cry, but would calm
down after the visits. The twins would also cry during the visits and appellant did not
appear to know how to comfort them. In contrast, evidence was presented that the
children were bonded with their respective foster mothers. 
          K.R.’s and the twins’ foster mothers each testified in detail about K.R.’s and
the twins’ special needs. The evidence showed not only that the foster mothers
understood the children’s special needs, but that the foster mothers were doing what
was needed to care for those special needs. The evidence also showed that the twins
and K.R. were thriving in their foster homes. In comparison, the evidence showed
that appellant appeared to have little knowledge of the twin’s special needs and had
made little effort to learn how to care for them, even though appellant knew that she
was at risk of losing her parental rights. 
          As mentioned, the psychologist who saw appellant indicated in her evaluation 
that appellant’s parenting style was “controlling and demanding.” She wrote that
appellant “will tend to have inappropriate expectations of her children’s behavior”
and that appellant “will lack understanding of [her children’s] developmental needs”
and “expects her children to act right and good.” The psychologist concluded that
appellant would “have problems handling parenting stress and will look to her
children as a source of comfort and assurance. This role reversal may cause her to
take their misbehavior more personally as if they are failing to take care of her by
making things difficult.” 
          The Department presented evidence that the children were adoptable. Each
foster mother testified that she desired to keep the children in her care long term. 
When asked whether she was asking the trial court to give her children back to her,
appellant testified, “Well I mean not today but I mean in some time.” The
Department also presented evidence that appellant had not provided any names of
relatives who were suitable to care for the children.
          The children’s caseworker, Christine Wagner, testified that appellant had not
obtained suitable housing. Appellant was living in a three-bedroom apartment
through a public assistance program. Appellant had claimed that the five children
were living with her to obtain the housing. Wagner was concerned that, if the
housing agency learned that she did not have custody of the children, appellant would
lose the housing. The caseworker testified that, when she visited the apartment, it
was in disarray with “clothes everywhere.” Wagner stated that the apartment lacked
furniture, but that appellant had told her that furniture was scheduled to arrive that
day. Appellant testified that her rent was being paid by Andrew Botley, the father of
the twins, a man who is married to another woman and has a criminal record.
          The evidence also showed that appellant had not complied with the service plan
by maintaining consistent employment. Though appellant showed that she had been
temporarily employed, she testified that, at the time of trial, she was purposefully
unemployed because she wanted to collect unemployment compensation. 
          In sum, given the evidence, the trial court could have reasonably inferred that
the children were at risk for neglect and abuse should they be placed with appellant
and that appellant could not provide the children with a stable home. We conclude
that the evidence, viewed in the light most favorable to a finding, was sufficiently
clear and convincing such that a reasonable fact finder could have formed a firm
belief or conviction that termination of the parent-child relationship between
appellant and her five children was in the children’s best interest. Thus, we hold that
the evidence was legally sufficient to support such finding.
          We overrule appellant’s first and second issues, challenging the legal and
factual sufficiency of the evidence to support the trial court’s termination of parental
rights to her five children. 
          In her statement of the issues, appellant’s third issue questions whether her
federal constitutional right of due process was violated when her parental rights were
terminated. Despite the initial statement, appellant does not offer separate argument
or authority for her third issue. Because issue three is not adequately briefed, it is
overruled. See Tex. R. App. P. 38.1(h). To the extent that the third issue was
intended to be subsumed by appellant’s first two issues, it, like those issues, is also
overruled. 
Sole Managing Conservatorship
          In her fourth issue, appellant asserts that the trial court erred in naming the
Department as the children’s sole managing conservator. Appellant contends that
“there must be sufficient evidence that [naming the Department as sole managing
conservator] is in the children’s best interest.” Appellant’s substantive argument is
as follows: “In light of the fact that the evidence is insufficient to support the court’s
decision to terminate Appellant’s parental rights, it follows that it was not in the
children’s best interest that [the Department] be appointed sole managing conservator
of Appellant’s children.” 
          As framed, appellant’s argument relies on a flawed premise: that the evidence
was not sufficient to support the termination of her parental rights. In the preceding
sections, we overruled appellant’s sufficiency challenges to the trial court’s
termination order. Thus, based on the argument presented, appellant’s challenge to
the trial court’s appointment of the Department as the children’s sole managing
conservator also fails.
          Accordingly, appellant’s fourth issue is overruled.
                                                         Conclusion
          We affirm the judgments of the trial court. 




                                         Laura Carter Higley
                                         Justice 

Panel consists of Justices Taft, Higley, and Bland.