COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-353-CV

 

 

IN THE
INTEREST OF T.J., D.J., AND M.J., CHILDREN

 

 

                                                                                                        

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                I.
Introduction








Appellants Juanita, mother of T.J., D.J., and
M.J., and Warren, father of D.J. and M.J., appeal the trial court=s order
terminating their parental rights to their children.[2]  In six points, Mother complains that the
evidence is legally and factually insufficient to support the trial court=s
finding that termination was in the children=s best
interest or either statutory ground for termination found by the trial
court.  In two points, Father complains
that the evidence is legally and factually insufficient to support either
statutory ground for termination found by the trial court.  We will affirm.  

                   II. 
Factual and Procedural Background

Mother is the mother of the three children who
are the subject of this termination proceeding: 
T.J., born December 2, 1996; D.J., born October 13, 2002; and M.J., born
September 5, 2003.[3]  Father is the father of the youngest two
children, D.J. and M.J.  

A.  Events
Leading up to Formal Removal








On October 14, 2002, one day after D.J. was born,
Child Protective Services (CPS) received its first referral concerning Mother
and Father.  It alleged that Mother Aappeared
half dead and was sitting in [a] chair completely out of it.  There was a large amount of marijuana sitting
on the coffee table with baggies and scales.@  It also alleged that Father had been drinking
in the house with the children and that the children were dirty.  CPS caseworker Brian Poly investigated the
referral.  During Poly=s
investigation, Mother admitted that she had frequently used cocaine in the
past, including when she was pregnant with D.J., although Mother said she had
not used cocaine for the past several months. 
Mother, who was breast-feeding D.J. at the time, admitted that she had
consumed an alcoholic beverage the previous night.  Father told Poly that he began using
marijuana at age seventeen, that he had last used marijuana seven or eight
months ago, that he was once a member of a criminal gang, and that he had a
criminal history that included convictions for possession of a controlled
substance (crack cocaine), two aggravated assaults with deadly weapons, two
assaults with bodily injury, and theft. 
Poly asked both parents to take a drug test; Father never took one, and
Mother tested positive for cocaine on October 31, 2002.    

In another interview in December of 2002, Mother
admitted that she had used cocaine several times since her first interview with
Poly.  Poly ruled the case Aunable
to parent . . . for neglectful supervision@ but did
not remove the children from Mother and Father=s
care.  Poly asked Mother and Father to
attend drug abuse classes, and CPS contracted with Catholic Charities for it to
provide family-based services to the family. 









On March 3, 2003, CPS received its second
referral, alleging that Mother and Father were using drugs regularly and that
Father had engaged in a physical altercation with another person while holding
D.J. in his arms.  CPS investigator Bron
Gose was unable to locate Mother, Father, and the three children for ten days
after CPS received the referral.  Gose
finally located Father, T.J., and D.J. at the home of the children=s
maternal grandmother, Patricia, and Father admitted to Gose that he had engaged
in an altercation with another person but denied that he was holding D.J. at
the time.  

On March 21, 2003, while the children were still
living with Patricia, CPS received its third referral, alleging that one of the
children had returned from a visit with Mother and Father with a facial
bruise.  Gose visited the children that
day and saw no signs of abuse.  During
Gose=s
investigation, Mother took several drug tests, the results were positive for
cocaine. Gose ruled out physical abuse but ruled Areason
to believe neglectful supervision.@  Because Gose determined that Catholic
Charities was providing services to the family and that the children were
primarily living with Patricia and their maternal great aunt, he did not take
the children into CPS=s care. 








CPS received its fourth referral concerning
Mother on September 5, 2003. It alleged physical abuse because M.J. was born
that day and had tested positive for cocaine. 
During CPS investigator Tracy Clary=s
investigation, Mother admitted to Clary that she had used cocaine two or three
times in the past month while pregnant with M.J.  On Clary=s
request, Mother completed a drug assessment, and the drug counselor recommended
inpatient drug treatment for Mother.








On September 9, 2003, Mother entered an inpatient
drug treatment program called LIGHT.  Her
two youngest children, D.J. and M.J., went with her, and T.J. stayed with
Micole Darden, Mother=s cousin.[4]  On December 12, 2003, Mother was kicked out
of the LIGHT program after she kissed another mother in the program, and CPS
placed all three children with their maternal great-grandmother, Willie Darden.[5]  CPS developed a safety plan that directed Willie
to supervise all contact between the children and their parents or Patricia.
However, Willie violated the safety plan by allowing Patricia to have
unsupervised visits with the children so CPS placed the children with a family
friend, Antoinette Turner.[6]  After CPS discovered that Turner also had
allowed unsupervised visits with Mother and Patricia, the decision was made to
remove the children from Turner=s care,
but the children could not be located for several months.  In March of 2004, CPS located the children at
Patricia=s house.    In the meantime, Mother entered another
inpatient drug treatment facility called Pine Street.  She successfully completed a twenty-day stay
at Pine Street on January 30, 2004, and several days later, she began Community
Addiction Treatment Services (CATS), an outpatient drug treatment program.  However, on March 1st and 4th of that year,
Mother tested positive for cocaine, and on March 5th, she was unsuccessfully
discharged from CATS.  Additionally, on
July 19, 2004, Father was convicted of robbery by threats and sentenced to two
years=
imprisonment.  

After CPS located T.J., D.J., and M.J. at
Patricia=s house,
it asked Patricia to take a drug test so that CPS could again attempt to
utilize her as a possible placement option, but Patricia tested positive for
cocaine.  Mother admitted that she had
recently used cocaine, and CPS took T.J., D.J., and M.J. into its care on April
2, 2004.  Three days later, the Texas
Department of Family and Protective Services (TDFPS) petitioned for
conservatorship and for termination of Mother=s and
Father=s
parental rights.  

B.  Events
Occurring After Formal Removal








CPS continued its involvement with Mother and
contracted with therapist Laura Greuner to provide therapeutic services to
Mother.  Mother did not regularly attend
the weekly therapy sessions.  When she
did attend, she talked about self-mutilation (cutting herself) and suicide, and
she discussed her on-going drug use.  She
was pregnant at the time, and she minimized the fact that she was using drugs
while pregnant because she used drugs while pregnant with her other children,
yet Athey
seem to be doing okay.@ 


On December 6, 2004, Mother entered an inpatient
drug rehabilitation program at Nexus Recovery Center.[7]  Although Mother did not cooperate fully
during the program, did not attend all group sessions, and had some anger
problems, she successfully completed the program on March 25, 2004.  Mother=s
primary counselor at Nexus recommended that she go to a transitional living
center and that she participate in individual counseling and the CATS program.
Mother did not go to a transitional living center; a CPS caseworker testified
that she spoke with a Nexus employee about enrolling Mother in the program, but
Mother claimed that the program would not accept her because she did not have
any income.  Mother also did not complete
the CATS program, and she only sporadically participated in individual counseling.  However, after leaving Nexus, Mother took two
negative drug testsCone on March 25, 2005 and
another just one week before trial.  








On August 25, 2005, five days before trial,
Mother visited with Greuner and informed her that she had quit using drugs,
that she was staying in a night shelter, and that if she were to get her
children back, she planned on living at the Salvation Army shelter with
them.   

Meanwhile, on May 5, 2005, Father was released
from prison for his robbery conviction.  After
his release, he visited his children six out of a possible eighteen times
before the date of trial. 

On August 30, 2005, after hearing testimony from
both sides, the trial court found that Mother=s
parental rights to T.J., D.J. and M.J. and Father=s
parental rights to M.J. and D.J. should be terminated because Mother and Father
had violated sections 161.001(1)(D) and (E) of the Texas Family Code and
because termination was in the best interest of the children.  Accordingly, the trial court entered an order
terminating Mother=s and Father=s
parental rights.  Both parents appeal
that order.

                                 III. 
Standard of Review








In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the State must
establish one or more of the acts or omissions enumerated under subdivision (1)
of the statute and must also prove that termination is in the best interest of
the child.  Tex. Fam. Code Ann. ' 161.001
(Vernon Supp. 2005); Richardson v. Green, 677 S.W.2d 497, 499
(Tex. 1984); Swate v. Swate, 72 S.W.3d 763, 766 (Tex. App.CWaco
2002, pet. denied).  Both elements must
be established; termination may not be based solely on the best interest of the
child as determined by the trier of fact. 
Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).  Because of the elevated status of
parental rights, the quantum of proof required in a termination proceeding is
elevated from the preponderance of the evidence to clear and convincing
evidence.  Santosky v. Kramer, 455
U.S. 745, 758‑59, 102 S. Ct. 1388, 1397 (1982); see also Tex. Fam. Code Ann. '
161.001.  The higher burden of proof in
termination cases alters the appellate standard for both legal and factual
sufficiency reviews.  In re J.F.C., 96
S.W.3d 256, 265 (Tex. 2002); In re C.H., 89 S.W.3d 17, 25 (Tex. 2002); In
re J.T.G., 121 S.W.3d 117, 124 (Tex. App.CFort
Worth 2003, no pet.).  Both legal and
factual sufficiency reviews in termination cases must take into consideration
whether the evidence is such that a factfinder could reasonably form a firm
belief or conviction about the truth of the matter on which the State bears the
burden of proof.  J.F.C., 96
S.W.3d at 265‑66; C.H., 89 S.W.3d at 25; J.T.G., 121 S.W.3d
at 124.  








Accordingly, in reviewing the evidence for legal
sufficiency in parental termination cases, we Alook at
all the evidence in the light most favorable to the finding to determine
whether a reasonable trier of fact could have formed a firm belief or
conviction that its finding was true.@  J.F.C., 96 S.W.3d at 266.  In conducting our review, we must disregard
all evidence that a reasonable trier of fact could have disbelieved; however,
we must consider undisputed evidence even if it does not support the
finding.  Id.  If, after conducting our review, we determine
that no reasonable trier of fact could have formed a firm belief or conviction
that its finding was true, then we must conclude that the evidence is legally
insufficient.  Id.








In determining a factual sufficiency point, we
must give due consideration to evidence that the trier of fact could reasonably
have found to be clear and convincing and then determine whether, based on the
entire record, a factfinder could reasonably form a firm conviction or belief
that the parent violated one of the provisions of section 161.001 and that the
termination of his or her parental rights would be in the child=s best
interest.  Tex. Fam. Code Ann. '
161.001; C.H., 89 S.W.3d at 25. 
In reviewing the factual sufficiency of the evidence, we must consider
all the evidence in the record, both that in support of and contrary to the
trial court=s findings.  C.H., 89 S.W.3d at 27‑29.  Additionally, we must consider whether
disputed evidence is such that a reasonable trier of fact could not have
reconciled that disputed evidence in favor of its finding.  J.F.C., 96 S.W.3d at 266.  If the disputed evidence is of such magnitude
that a trier of fact could not reasonably have formed a firm belief or
conviction that its finding was true, then the evidence is factually
insufficient.  Id. 

                               IV. 
Endangerment Finding

In Father=s two
points and in Mother=s third through sixth points,
they complain that the evidence was legally and factually insufficient to
support the trial court=s endangerment findings.  








Endangerment means to expose to loss or injury,
to jeopardize.  Boyd, 727 S.W.2d
at 533; J.T.G., 121 S.W.3d at 125; see also In re M.C., 917
S.W.2d 268, 269 (Tex. 1996).  To prove
endangerment under subsection (D), TDFPS had to prove that Mother and Father
(1) knowingly (2) placed or allowed their children to remain (3) in conditions
or surroundings that endangered their physical or emotional well‑being.  See Tex.
Fam. Code Ann. ' 161.001(1)(D).  Under section 161.001(1)(E), the relevant
inquiry is whether evidence exists that the endangerment of the children=s
physical well‑being was the direct result of Mother=s and
Father=s
conduct, including acts, omissions, or failures to act.  J.T.G., 121 S.W.3d at 125; see Tex. Fam. Code Ann. '
161.001(1)(E).  Additionally, termination
under section 161.001(1)(E) must be based on more than a single act or
omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.  J.T.G., 121
S.W.3d at 125; see Tex. Fam. Code
Ann. ' 161.001(1)(E).  However, it is not necessary that the parent=s
conduct be directed at the children or that the children actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.  The specific danger
to the children=s well‑being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the children=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).

Stability and permanence are paramount in the
upbringing of children.  See In re
T.D.C., 91 S.W.3d 865, 873 (Tex. App.CFort
Worth 2002, pet. denied).  A factfinder
may infer from past conduct endangering the well‑being of the children
that similar conduct will recur if the children are returned to the
parent.  See In re D.L.N., 958
S.W.2d 934, 941 (Tex. App.CWaco
1997, pet. denied), disapproved on other grounds by J.F.C., 96
S.W.3d at 256, and C.H., 89 S.W.3d at 17.  Drug use and its effect on a parent=s life
and her ability to parent may establish an endangering course of conduct.  Dupree v. Tex. Dep=t of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).








Evidence of criminal conduct, convictions, and
imprisonment prior to the birth of a child will support a finding that a parent
engaged in a course of conduct that endangered the child=s
well-being.  J.T.G., 121 S.W.3d at
133.  While imprisonment alone does not
constitute a continuing course of conduct that endangers the physical or
emotional well-being of a child, it is a fact properly considered on the issue
of endangerment.  Boyd, 727 S.W.2d
at 533-34; R.W., 129 S.W.3d at 743-44.  









The record contains the following evidence of
subsection (D) environmental endangerment and subsection (E) course of conduct
endangerment to the physical or emotional well‑being of the
children.  Because the evidence
concerning these two statutory grounds for termination is interrelated, we
consolidate our examination of it.  J.T.G.,
121 S.W.3d at 126.      Father admitted to
using drugs in the past, beginning at age seventeen, and admitted that he has
sold drugs in the past.  He has two prior
convictions for possession of cocaine. 
During CPS=s investigation into the first
referral concerning Mother and Father, Gose asked Father to take several drug
tests, but Father never took one.  Father
testified that he lacked transportation to go take a drug test and that once,
he showed up to take a test but that he did not have proper
identification.  However, Gose testified
that he had once tried to pick up Father to take him to his scheduled drug
test, but no one answered the door. Father testified that he never used drugs
around the children but that he often drank around them.  Father testified that he still drinks Alike two
or three cans of beer@ every day and that he does not
believe he could care for his children after drinking that amount. 

The record also shows that Father has an
extensive criminal history beginning in 1995 and continuing through July 19,
2004.  He has been incarcerated for much
of his children=s lives.  Several of Father=s
convictions are for violent crimes, and one referral received by CPS alleged
that Father had gotten into a physical altercation while holding D.J. in his
arms, although Father denied that he was holding D.J. at the time.  See J.T.G., 121 S.W.3d at 125 (noting
that Aabusive
or violent conduct by a parent . . . may produce an environment that endangers
the physical or emotional well‑being of a child.@) Father
testified that he knew Mother was using cocaine but that there was A[n]ot
much [he] could do.@ 
Father testified that he attended several drug classes with Mother in
the beginning of CPS=s involvement in this case and
that he tried to remove D.J. from Mother=s
drug-using environment by taking the baby to visit his relatives for hours at a
time.  He testified that he knew Athe kids
couldn=t be
removed from [Mother=s] residence.@  








The record demonstrates that Mother has a history
of illegal drug use, including during some of her pregnancies.  Mother admitted to using cocaine throughout
CPS=s
involvement in this case, and she tested positive for cocaine at least five
times.  CPS received a total of four
referrals regarding Mother and FatherCthree of
which dealt with Mother=s drug use.  Even after Mother successfully completed a
twenty-day stay at the Pine Street inpatient drug treatment facility, she
tested positive for cocaine and failed to complete the CATS program a little
over a month later.[8]  Additionally, despite Mother=s
contention that she had stopped using drugs prior to trial and despite her two
recent clean drug tests, the trial court was not required to ignore her history
of drug use merely because it allegedly abated before trial.  See R.W., 129 S.W.3d at 741.  Therefore, even if the trial court believed
that Mother had stopped using drugs prior to trial, the court could have
believed that Mother=s drug use would likely recur
and further jeopardize her children=s
well-being.  See id.

Two referrals concerning Mother and Father
alleged that they were using or selling drugs inside their home.  CPS caseworker Poly testified that during his
investigation into the first referral concerning Mother and Father,
five-year-old T.J. seemed to know what drugs were.  Poly was confused by T.J.=s answer
to Poly=s
questions about drugs; T.J. first said that cigarettes were drugs, but then he
talked about drugs Abeing black and having to wrap
up.@  T.J. also said his sister was once Aholding
weed@ and
that Mother Arolled weed.@  








Additionally, the record demonstrates that Mother
was sexually abused by her grandmother=s
husband, Johnny, when she was a child. 
However, after M.J. was born, Mother allowed the hospital to release
M.J. into Willie=s care despite the fact that
Willie was still married to Johnny. 
Mother also recommended Willie as a voluntary placement for the children
during CPS=s involvement in the case. 








We have carefully reviewed the entire
record.  Looking at the evidence in the
light most favorable to the trial court=s
findings, giving due consideration to evidence that the trial court, as
factfinder, could reasonably have found to be clear and convincing, we hold
that the court reasonably could have formed a firm belief or conviction that
Mother knowingly placed T.J., D.J., and M.J. in conditions and engaged in
conduct that endangered the children=s
physical or emotional well‑being.  See
Tex. Fam. Code Ann. '
161.001(1)(D), (E); J.F.C., 96 S.W.3d at 265‑66; C.H., 89
S.W.3d at 25; J.T.G., 121 S.W.3d at 124. 
Additionally, giving due consideration to evidence that the trial court
could reasonably have found to be clear and convincing, we hold that the trial
court reasonably could have formed a firm belief or conviction that Father
knowingly placed D.J. and M.J. in conditions and engaged in conduct that
endangered the children=s physical or emotional well‑being.[9]  See Tex.
Fam. Code Ann. ' 161.001(1)(D), (E); C.H.,
89 S.W.3d at 25; J.T.G., 121 S.W.3d at 124.   Accordingly, we hold that the evidence is
legally and factually sufficient to support the trial court=s
findings on endangerment.  We overrule
Father=s two
points and Mother=s third through sixth points.

                                 V.  Best
Interest Finding

In her first two points, Mother argues that there
was insufficient evidence to support the trial court=s
finding that termination of her parental rights was in her children=s best
interest.  TDFPS argues that there was
ample evidence to support the trial court=s
finding.








A strong presumption exists that the best
interest of a child is served by keeping custody in the natural parent.  In re W.E.C., 110 S.W.3d 231, 240
(Tex. App.CFort Worth 2003, no pet.).  The factfinder may consider a number of
factors in determining the best interest of the child, including the
following:  (1) the desires of the child;
(2) the emotional and physical needs of the child now and in the future; (3)
the emotional and physical danger to the child now and in the future; (4) the
parental abilities of the individuals seeking custody; (5) the programs
available to assist these individuals to promote the best interest of the
child; (6) the plans for the child by these individuals or by the agency
seeking custody; (7) the stability of the home or proposed placement; (8) the
acts or omissions of the parent which may indicate that the existing parent‑child
relationship is not a proper one; and (9) any excuse for the acts or omissions
of the parent.  Holley v. Adams,
544 S.W.2d 367, 371‑72 (Tex. 1976). 
Some listed factors may be inapplicable to some cases; other factors not
on the list may also be considered when appropriate.  C.H., 89 S.W.3d at 27.








Regarding the first factor, the children did not
testify at trial, but Micole, with whom T.J. had been living since October of
2004, testified that T.J. was adjusting very well.  She testified that T.J. was Apretty
anxious@ about
reuniting with Mother and that if Micole were able to adopt him, he would have
much more stability.  Tonyia Brown, the
CPS caseworker assigned to the case after the show-cause hearing, testified
that T.J. was Amore secure in the fact that he=s [with
Micole] and he=s asked not to move him.@  As for D.J. and M.J., both had bonded with
their foster mother, Daphne Whitaker, and her six-year-old son. 

Regarding the second factorCthe
children=s
present and future physical and emotional needsCBrown
testified that T.J. was doing well with Micole and that he was receiving
therapy at his school.  Micole testified
that T.J. was doing very well in school and that he got into trouble like most
eight-year-old children do.  Brown
testified that M.J. and D.J. were also doing great and that they did not have
any special medical needs.  D.J. was once
Aa little
behind@
developmentally, but at the time of trial, both girls were developmentally on
track.  Whitaker testified that D.J. Ahas a
lot of anger issues@ but that D.J. had been
receiving therapy.  Whitaker testified
that M.J. also had tantrums but that they were not as bad as D.J.=s.  








Regarding the third factorCthe
present and future physical and emotional dangers to the childrenCthroughout
CPS=s
investigations, caseworkers expressed no concerns about the condition of Mother=s
apartment or the amount of food in the home. 
However, Brown testified that Mother was not stable enough to care for
her children.  At the time of trial,
Mother was living in a night shelter, and she was working for the first time in
at least a year, although only on Saturdays at the night shelter.  Mother has a history of illegal drug use, and
the record also demonstrates that Mother is bipolar, has a history of
depression, and was not taking her medications properly.  Mother talked with her therapist about
suicide and about harming herself. 
Mother=s therapist testified that she
was concerned with Mother=s Aability
to judge who might be a risk [to her children].@   

Regarding Mother=s
parenting abilitiesCthe fourth Holley factorCMother
admitted to using cocaine while pregnant with several of her children, and M.J.
tested positive for cocaine when she was born. 
Mother left her children in the care of a man who had sexually abused
Mother when she was young.  Mother=s
therapist testified that Mother viewed T.J., D.J., and M.J. more like her
friends instead of her children, that she referred to T.J. as Aher
homey,@ and
that she would allow him to watch R-rated movies.  Both Mother=s
therapist and Brown expressed concerns about Mother=s
stability, especially because she was living at a night shelter.  Brown testified that although Mother had been
drug-free for several months, she had not changed her living environment.
Mother completed one parenting class that Brown recommended for her but failed
to complete the next parenting class that Brown recommended.  Mother testified that she learned how to
interact with her children in the parenting class. 








Concerning the fifth factor, Mother had utilized
a variety of the programs offered by CPS, although often unsuccessfully.  These programs included inpatient drug
treatment, outpatient drug treatment, some parenting classes, some individual
counseling, therapy, and Narcotics Anonymous classes.     Regarding
CPS=s plans
for the childrenCthe sixth and seventh factorsCBrown
testified that CPS=s long-term plan was for T.J. to
remain with Micole and for D.J. and M.J. to remain with Whitaker.  Micole planned to adopt T.J., and Whitaker
expressed an interest in adopting D.J. and M.J. after she learned more about
D.J.=s anger
issues.  Micole testified that she has
been caring for T.J. for most of his life. 
She testified that T.J. saw his sisters once or twice a week, and
Whitaker testified that it was important for the girls to continue these
visits. 

Mother planned to take her children to a homeless
shelter if they were returned to her.  At
trial, Mother admitted that a homeless shelter is not an appropriate setting
for her children, but she stated, A[I]f I
get my kids back everything is going to fall into place.@  During Mother=s stay
at Nexus, she reported that she had no income over the previous twelve months
and that she supported herself through family, friends, and Aillegal
gain.@  At the time of trial, Mother was taking
classes to get her GED, although she had not yet finished.  She worked at the night shelter on Saturdays
and volunteered at the shelter during the week. 








The record as outlined above provides evidence of
Mother=s acts
or omissions indicating that the existing parent-child relationship was not in
her three children=s best interestsCthe
eighth Holley factor.  Mother has
a long history of illegal drug use, and although there is evidence that she had
been drug-free since she left Nexus, the record demonstrates that Mother failed
to follow through with Nexus=s
recommended treatment after she left the facility. Mother=s
therapist testified that Mother did not take responsibility for the reason her
children were removed from her care. 
Instead, Mother told her therapist that Ashe wasn=t too
sad because if she loses these [three children] she can just have some more.@ 

Finally, concerning the ninth factorCany
excuse for the parent=s acts or omissionsCMother
testified that the LIGHT, Pine Street, and CATS programs did not help her.  However, she testified that the Nexus program
Aseemed
to help@ her and
that she had been drug-free since she left there.  Mother testified that she had not been able
to find employment or a home of her own because no one would talk to her when
she was having a mood swing or was depressed. 








Looking at all of the evidence in the light most
favorable to the best-interest finding, we hold that a reasonable trier of fact
could have formed a firm belief or conviction that its finding was true.  See J.F.C., 96 S.W.3d at 266; J.T.G.,
121 S.W.3d at 124‑25. 
Additionally, giving due consideration to evidence that the factfinder
could have found to be clear and convincing, and based on our review of the
entire record, we hold that a reasonable trier of fact could have formed a firm
belief or conviction that termination of Mother=s
parental rights would be in the best interest of T.J., D.J., and M.J.  See W.E.C., 110 S.W.3d at 247.  Accordingly, we hold that the evidence is
legally and factually sufficient to support the trial court=s
best-interest finding.  We overrule
Mother=s first
and second points.

                                        VI. 
Conclusion

Having overruled Mother=s six
points and Father=s two points, we affirm the
trial court=s judgment.

 

 

PER
CURIAM

 

PANEL F:    WALKER, J.; CAYCE, C.J.; and MCCOY, J.

 

DELIVERED: March 30, 2006











[1]See Tex. R. App. P. 47.4.





[2]The trial court also
terminated the parental rights of T.J.=s alleged father, but he is not a party to this
appeal.  





[3]Mother also has one other
child who is not a party to this proceeding. 






[4]Clary did not consider
Father as a possible placement option because Patricia told Clary that Father
was in jail at the time.  





[5]Although CPS was
satisfied with the care Micole provided for T.J., it decided to remove T.J.
from Micole=s care because Patricia
harassed Micole, causing the placement to break down.  CPS did not place the children with Patricia
because it discovered that Patricia had a history of drug abuse. 





[6]CPS did not take the
children into custody at that point because Mother was cooperating with CPS and
using its services.  





[7]Mother was seven months
pregnant when she entered Nexus.  





[8]Mother also received a
certificate of completion from a second stay at Pine Street, but she completed
only fourteen days of a twenty-eight day program. 





[9]TDFPS argues that Father
failed to preserve error regarding his legal sufficiency complaint because his
statement of points that he presented to the trial court included only his
factual sufficiency complaint.  See Tex. Fam. Code Ann. ' 263.405(i) (Vernon Supp.
2005) (providing that A[t]he appellate court may
not consider any issue that was not specifically presented to the trial court
in a timely filed statement of the points on which the party intends to appeal@).  However, because we hold that the evidence is
factually sufficient to support the trial court=s endangerment findings,
the evidence is necessarily legally sufficient to support the findings.  See British Am. Ins. Co. v. Howarton, 877
S.W.2d 347, 352 (Tex. App.CHouston [1st Dist.] 1994, writ dism=d by agr.).  Thus, we do not address TDFPS=s contention.