NUMBER 13-06-503-CV


COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


IN THE INTEREST OF E.A., ET AL.,
 

 




On appeal from the County Court at Law No. 5 


of Nueces County, Texas.


 


MEMORANDUM OPINION



Before Justices Yañez, Rodriguez, and Garza


Memorandum Opinion by Justice Yañez



 Appellee, the Texas Department of Protective and Regulatory Services (the
Department), brought suit against appellant, Nashely Amado, the biological mother of E.A.
and K.A., for termination of her parent-child relationship under section 161.001(1)(D),
(1)(E), (1)(N), (1)(O), and (1)(P) of the Texas Family Code. (1) Following a bench trial in April
2006, the trial court found that one or more statutory grounds for termination existed and
that termination of the parent-child relationship was in the children's best interest. By one
issue, appellant challenges the factual sufficiency of the evidence to support the court's
finding that termination was in the children's best interest. (2) We affirm.

I. Factual Background

1. The Department's Testimony

 E.A. was born on March 4, 1999. On July 20, 2001, when E.A. was two years old,
the Department removed E.A. after appellant attempted to commit suicide. E.A. remained
in the Department's possession for approximately six months before being returned to
appellant. In February 2003, the Department removed E.A. again after appellant's then-boyfriend, Scott Peña, ran over appellant's leg with a vehicle in E.A.'s presence; removal
was also predicated on the drug abuse history of both appellant and her boyfriend. This
time, rather than remove E.A. from appellant, the Department elected to place E.A. at the
South Texas Children's Home (STCH). Parents are allowed to temporarily leave their
children at STCH when they are unable to care for them; parents are allowed to retain
custody and visit with their children.

 The Department put together a family plan of service that appellant needed to
complete prior to removing E.A. from STCH. Appellant agreed to the plan, which required
her to participate in parenting and individual counseling, follow all recommendations by her
counselors, participate in the Texas Commission on Alcohol and Drug Abuse program,
submit to random drug tests, refrain from any criminal activity, go to the Women's Shelter
if she continued to have problems with men, participate in "Anger, Insight, and Rage"
classes, and participate in Charlie's Place. According to Carol D. Rice, an investigator with
the Department, completion of this plan usually takes a minimum of three months to a
maximum of six months. E.A. remained at STCH for twenty months.

 Appellant agreed to only have supervised contact with E.A. at STCH. Rice
explained that prior to E.A.'s placement at STCH, the Department made it clear to
appellant that if she were to take E.A. out of the facility, and possess him on her own
without supervision, the Department may elect to seek E.A.'s removal from her. In fact,
on at least one occasion, appellant expressed her desire to remove E.A. from the facility
so that he could live with her, but the Department apparently made it clear to her that if she
did this, it would seek to remove E.A. Rice stated that the only reason for this was
"because of [appellant's] substance abuse." 

 Appellant did not support E.A. while he was at STCH. In commenting on appellant's
use of the Department's services, Rice testified:

 She was very inconsistent. Sometimes she would participate in parenting,
sometimes she wouldn't. Sometimes she would go to counseling and
sometimes she wouldn't. She did not ever demonstrate the ability to be a
proper caregiver. She continually used drugs, continually moved from place
to place, did not have a stable home environment with her son. She was
relying on her grandmother initially, and then she didn't have that support. 
She appeared to rely on men who were not appropriate, and she continually
went back with Scott Peña, and then trying to deny that she was not around
him.


Rice, who was involved in appellant's case from February 2003 to October 2004, testified
that appellant's drug abuse and unstable life had been a recurring problem for as long as
she knew appellant. Rice also stated, however, that appellant and E.A. had a "very close
bond" with one another, and that E.A. vocalized to Rice's coworkers that he missed
appellant. E.A. was ultimately returned to appellant in November 2004.

 Approximately three months after E.A. was returned to appellant, the Department
determined that it was necessary to again remove E.A. from appellant. Prior to February
8, 2005, appellant and E.A. were living at a shelter called Hope House. Brenda Lopez, a
CPS investigator, periodically visited E.A. and appellant, who was pregnant with K.A., at
this location. She observed that "[t]hey appeared to have a good relationship" and that
E.A. "appeared to be very attached to [appellant]." According to Lopez, "there wasn't a
concern for removal at that particular time."

 On the evening of February 8, appellant was dismissed from Hope House and left
without a place to live. It was Lopez's understanding that appellant was dismissed
because "she had a disagreement with another shelter member, and also some
disagreements with the director, and the director was accusing her of vandalism of some
property there at the shelter. There were also concerns by that shelter director that
[appellant] . . . vandalized property and was possibly using drugs." Lopez attempted to get
appellant into a Salvation Army shelter, as well as two other shelters, but was
unsuccessful. Lopez learned at this time that appellant had tested positive for drugs. (3) 
Appellant requested that CPS allow her and E.A. to stay with the Bouttes, a married couple
she was friends with. CPS, however, rejected her request after discovering that Mr. Boutte
was a registered sex offender. At around midnight, Lopez and her supervisor determined
that E.A. needed to be removed from appellant and placed in foster care. Removal was
predicated on neglectful supervision and physical neglect; the physical neglect stemmed
from appellant's present inability to provide for E.A.'s food, clothing, or shelter.

 K.A. was born on March 31, 2005. The next day, Rebecca Cavazos, a child
protective specialist with the Department, assisted in removing K.A. from appellant. K.A.
was removed because of neglectful supervision. Though appellant and K.A. both tested
negative for substance abuse at the time of delivery, the Department accused appellant
of neglectful supervision because (1) she told Cavazos that she was under the influence
of methamphetamines on February 22, 2005, which was the date of E.A.'s adversary
hearing, and (2) she tested positive for drug use during that same month. At the time of
this suspected drug use, appellant was eight and a half months pregnant with K.A. (4)

 Appellant was then ordered to perform services, in which she agreed to attend
parenting classes, attend individual counseling, submit to drug assessments, follow any
recommendations from those drug assessments, refrain from contact with any individuals
who enticed her to use illegal substances, pay child support in the amount of five dollars,
and obtain employment and housing. Cavazos testified that appellant obtained a job, but
Cavazos had difficulty recalling what other services appellant fulfilled.

 Melissa Villarreal, a caseworker, testified that appellant had "not completed any of
her services." Appellant admitted to Villarreal that she had used cocaine, marijuana, and
methamphetamines in the past, and that she had taken drugs during her pregnancy with
K.A. Villarreal stated that she believed termination of appellant's parental rights was in the
best interests of E.A. and K.A. because appellant "has not completed any of her services,
she has not paid child support," and "[s]he still continues to involve herself with individuals
that are not appropriate." Villarreal explained that appellant "had boyfriends in the past that
she's met at drug rehab. She is currently seeing a gentleman that she does not know his
last name or where he's employed." Furthermore, appellant only attended three parenting
classes (no classes were attended in the preceding six months), she did not attend any
counseling sessions in the past year, she did not comply with the ART program, and she
failed her drug tests. Appellant had no contact with the Department from March 14, 2006
until mid-June. The last time appellant visited the children was on December 29, 2005. 
After that time, appellant was unable to see her children because she failed to have two
consecutive clean drug screens. Furthermore, evidence at trial revealed that appellant had
committed theft on June 22, 2005; she was convicted on August 1.

 Villarreal acknowledged that appellant was currently living in a apartment, which she
had visited. The apartment was obtained through MHMR's Project Home program, which
involves the State paying for appellant's housing and electricity for one year and assisting
in job placement. The apartment had two bedrooms and was furnished. Appellant saw
the same male individual at the apartment on more than one occasion and she also saw
children in the apartment. Villarreal believed that individuals were living with appellant in
violation of the rules governing the Project Home program.

 Shelly Hayles, the children's guardian ad litem, described E.A. as "a very intelligent
little boy" who has always wanted "to go back with his mother." She did express concern,
however, regarding E.A.'s expressions of anger. According to Hayles, "There's been
reports when [E.A.] was in school that he would--he was aggressive towards other
children. It's documented that he was aggressive towards his prior foster parents, as well
as the current foster parent that he's been with." E.A. also expressed anger towards
appellant.

 Hayles revealed that E.A. and K.A. were removed from their foster home
approximately one month before appellant's hearing. Since that time, they had not living
with each other and no visits had been arranged. Their separation was the result of an
investigation that concerned an allegation of physical abuse on K.A. Bruises were
discovered on K.A., which led to K.A.'s foster home and day-care center being
investigated. At the time of trial, investigators had ruled out the foster home as the source
of abuse. Hayles informed the trial court that she believed a "number of things could have
happened" to cause K.A.'s bruising. She stated:

 [K.A.] is developmentally delayed, and from my interaction with him, it was
quite evident that he is suffering from--he suffering from that. Physically,
he--he's known to, you know--I don't know what the medical term is, but he
kind of, you know, thrashes himself around and bumps himself numerously,
and it's happened in my--in my presence. And the foster--prior foster mom
was concerned about that, and that's why she went to great lengths to find
out what is causing [K.A.] to behave the way he behaves.


 With regard to appellant, Hayles stated that she had her own apartment and that
she appeared to have her own vehicle. When asked what if anything about the apartment
would make it unfit for children, Hayles stated:

 Well, the fact that there's other people in the home, I would have concerns
about, because I still don't know who these individuals are. She hasn't
stated to me what the relationship is. She said it's a friend, and I have been
there on several occasions and seen these individuals in the home.


Hayles further stated that she went to the apartment with Villarreal and saw four children;
these children told Villarreal that they were living there.

 Hayles testified that she believed it was in the best interests of the children to
terminate appellant's parental rights. Hayles believed that appellant had not attempted to
complete her service plan in order to get her children back and "that the children would
achieve stability and permanency through the process of termination and possible
adoption." If appellant's parental rights were terminated, the Department would try to have
the children adopted together. From what Hayles had been told, "the likelihood of them
being adopted is very high" and "adoption should happen rather quickly." At the conclusion
of her testimony, the trial court asked Hayles: "Are there any conditions that might be
ordered by the Court, imposed, or changes in the mother's life . . . that if they were in
place, or could be put in place, that you might believe that it would be in the children's best
interest to be returned to their mother?" Hayles responded:

 No, Your Honor, simply because--just the history with CPS involvement prior
to, you know, CASA even getting involved in this case. There has been a lot
of people involved, caseworkers, that have tried, and that I have worked with,
hand-in-hand, to help [appellant] as much as possible, and there's nothing,
I believe, at this point, that can be done, other than [appellant] complying
with the services that she's been given and reviewed many times. I just don't
believe there's anything that can be done differently that hasn't been done
already.


2. Appellant's Testimony

 At the time of the hearing, appellant was 27 years old. She was raised by her
grandparents nearly her entire life. Her grandparents provided her with a very comfortable
life style; according to appellant, she never had to learn how to care for herself while they
supported her. She began suffering from depression when her grandfather passed away;
she was 17 years old. In July 20, 2001, appellant contemplated committing suicide. Her
desire to commit suicide stemmed, in part, from the fact that she was going through a
divorce, which caused her to feel "overwhelmed." (5) Appellant's friend, sensing that
appellant was going to hurt herself, called the police and prevented appellant from making
any attempt at suicide. As a result of the call to police, appellant received psychiatric
treatment and E.A. was removed from her possession. (6)

 Appellant's grandmother supported her when E.A. was born, but terminated all
support when E.A. was removed from appellant in February 2003. The Department
removed E.A. and placed him at STCH after an alleged altercation took place between
appellant and her then-boyfriend, Scott Peña; appellant asserts, however, that her injuries
stemmed from an accident, not an altercation. Appellant was simply standing next to her
vehicle, which contained Peña in the driver's seat and E.A. in his car seat, when Peña
moved the vehicle and accidentally ran over her legs. Since February 2003, appellant has
not had any family members that she can depend on for support. Appellant had a very
difficult time adjusting to the sudden loss of her grandmother's financial support.

 While E.A. was at STCH, appellant was sexually assaulted; this assault resulted in
her becoming pregnant with K.A. Appellant does not know the identity of K.A.'s father. In
contrast to testimony noted earlier, appellant denied taking drugs while she was pregnant
with K.A. When E.A. was returned to appellant after his stay at STCH, he was again
removed after appellant found herself without a shelter to live in. Unable to find a shelter,
appellant suggested to the Department the possibility of her and E.A. temporarily living with
the Bouttes, a married couple she knew. Appellant met Mr. Boutte while "attending NA,"
which she attended because she is a "recovering addict." Her decision to stay with the
Bouttes, however, was based on her closer relationship with Mrs. Boutte. Appellant did not
know that Mr. Boutte was a registered sex offender until the Department informed her of
that fact. Had she known that Mr. Boutte was a sex offender, she would have never
contemplated staying there. E.A. was ultimately removed from appellant on February 8,
2005, and when appellant gave birth to K.A. on March 31, he was removed the next day. 
Since K.A.'s removal, appellant has only seen him three or four times.

 Appellant became severely depressed after E.A. was removed. As a result, she
began to use methamphetamines for five to six months before turning herself in to police
for an outstanding theft charge. Appellant turned herself in because there was a warrant
out for her arrest as a result of her not appearing in court. She spent four months in jail. 
According to appellant, "I was there so long because I had spoken to Judge Saldana and,
you know, I wanted help, so they kept me in jail to help me sober up and help me find
rehab and stuff like that." Appellant was released from jail on probation, which happened
to terminate the day of the trial court's hearing on this cause. Appellant asserts that she
has not used drugs since leaving jail. The last time appellant used cocaine was around
June 2002.

 With K.A. and E.A. in the Department's custody, appellant was required to take drug
tests in order to visit with the children. Appellant initially took a few drug tests, but later
refused to take them. When asked why she stopped taking the tests, appellant replied:

 Because I became very irritated with the--the false--the wrong--the results
that kept coming back wrong. Every time I would see Melissa, she would
want to drug test me, and since I have gotten out of jail, I have been clean. 
I am not going to risk my freedom again for anything. That not only
jeopardizes my getting my children, but it jeopardizes my probation, my going
back to jail, and I was not willing to continue to risk that over something I was
not doing.


Appellant later stated:

 I felt that the best decision to make was to stop doing [the drug testing]. My
lawyer, when I started talking to him, also advised me not to do that, to get
in contact with them and--and try again, and I did. And I, you know, went to
a couple of the parenting classes again, and I submitted to the tests, and
again, you know, the same thing was happening, so again, I retrieved myself
[sic]. I believed that, you know, I only had so much time to do what I could
to try to prevent losing my children, so I concentrated on the things that I
could do, that weren't going to hurt my progress or hurt me here in court, so
I got a job, I have worked, I have, done the footwork to get an apartment,
done what I needed to do to get a vehicle, and--and furniture and, you know,
a crib and food in the house, and done the things that I can do without it
further hurting--


 At the time of the hearing on termination, appellant was working as a waitress at
Bottoms Up, a job she had for a little over two months. Before working there she had been
unemployed for five months. Prior to this unemployment, she had worked at Blockbuster,
McDonald's, and Portobello's. Appellant also now owns her own vehicle, though she does
not have driver's insurance. The vehicle was purchased through money appellant earned
waitressing. Appellant stated that she saved money to purchase the vehicle and that she
had never done something like that before.

 Appellant lived in her apartment for three weeks prior to the termination hearing. 
She obtained the apartment through Project Home, which is a "program designed for
MHMR patients who are homeless." The program is run in part by Ginny Salinas, who
works as a caseworker. According to appellant:

 [T]heir goals is [sic] to, in the end, for you to be able to . . . maintain yourself,
live life normally, take your medications regularly, go to your appointments. 
One of our goals together was to get the kids back, which is why we got a
two bedroom, just in case I do get them back, that way I would have room for
them.


 . . . .


 She's helping me . . . get certain paperwork that I need to help you get back
into school. The program is a year, but she said depending on . . . if I go to
school instead of working, what they will do is they'll pay everything so I can
go to school and they also help me find programs that will pay for my school. 
PEL [sic] grants, TRC, different types of grants. Things that I won't have to
pay back in the end.


Appellant had to apply to participate in Project Home, which is very selective in that
hundreds apply, but only fifteen are assisted. She applied to Project Home on her own
initiative; CPS did not refer her to the program. Appellant refuted the contention that she
was living with other people at her apartment. She explained that the male individual and
the four children seen by Hayles and Villarreal were only weekend guests who were visiting
from out of town.

 Appellant finished about three semesters of college a few years ago. She
expressed her desire to go back to school for the purpose of becoming a medical assistant
through a career institute. She then wants to work for awhile before returning to college
so that she could get a job relating to elementary education.

 In explaining the difference between her past and present character, appellant
stated:

 I think that there have been a lot of circumstances that have gone on, part
of life, that at certain points probably put me in a state of mind where I was
not fully emotionally capable, no, but I think that I have also taken the steps
and done a lot of learning on how to cope, and, you know, take my
medication so that I am capable now of being able to do the things that I
needed to do.


Though appellant acknowledged she had a second theft charge pending against her, she
stated that, at the present time, she (1) is not using drugs, (2) is taking her prescribed
medication regularly, (3) is not depressed, (4) is not surrounding herself with people who
will get her in trouble, and (5) is visiting Ginny Salinas once a week and is receiving
encouraging support from her. When asked how the trial court could be sure she was not
"going to mess up again," appellant responded: "Because the thought of never seeing my
children again is so painful, and if I was to get them back, I think I would do everything to
make sure that he never went away again . . . ."

II. Factual Sufficiency of the Evidence to Support Termination

 Appellant contends the evidence is factually insufficient to support the court's finding
that the parent-child relationship between her and her two children should be terminated. 
Parental rights can be terminated only by a showing of clear and convincing evidence that
the parent committed one or more of the acts specifically named in the family code as
grounds for termination and that termination is in the child's best interest. (7) Clear and
convincing evidence is "the measure or degree of proof that will produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations sought to be
proved." (8)

A. Standard of Review

 The higher burden of proof in termination cases alters the appellate standard of
factual sufficiency review. (9) In a factual sufficiency review, the inquiry must be whether the
evidence is such that a factfinder could reasonably form a firm belief or conviction about
the truth of the allegations. (10) A court of appeals should consider whether disputed
evidence is such that a reasonable factfinder could not have resolved disputed evidence
in light of its finding. (11) While we do not view the evidence in the light most favorable to the
challenged finding, our review must maintain the respective constitutional roles of
factfinders. (12) If in light of the entire record, the disputed evidence that a reasonable
factfinder could not have credited in favor of the finding is so significant that the factfinder
could not reasonably have formed a firm belief or conviction, then the evidence is factually
insufficient. (13)

B. Statutory Termination Grounds

 In its findings of fact and conclusions of law, the trial court found that appellant had
committed acts that violated the following subsections of 161.001(1) of the family code:

 (D) knowingly placed or knowingly allowed the children to remain in
conditions or surroundings which endanger the physical or emotional well-being of the children;

 

 (E) engaged in conduct or knowingly placed the child with persons who
engaged in conduct which endangers the physical or emotional well-being
of the child;

 

 (N) constructively abandoned the child who has been in the permanent or
temporary managing conservatorship of the Department of Family and
Protective Services or an authorized agency for not less than six months,
and: (i) the department or authorized agency has made reasonable efforts
to return the child to the parent; (ii) the parent has not regularly visited or
maintained significant contact with the child; and (iii) the parent has
demonstrated an inability to provide the child with a safe environment;

 

 (O) failed to comply with the provisions of a court order that specifically
established the actions necessary for the parent to obtain the return of the
child who has been in the permanent or temporary managing
conservatorship of the Department of Family and Protective Services for not
less than nine months as a result of the child's removal from the parent
under Chapter 262 for the abuse or neglect of the child;

 

 (P) used a controlled substance, as defined by Chapter 481, Health and
Safety Code, in a manner that endangered the health or safety of the child,
and: (i) failed to complete a court-ordered substance abuse treatment
program; or (ii) after completion of a court-ordered substance abuse
treatment program, continued to abuse a controlled substance[.]


On appeal, appellant does not contend that the evidence is factually insufficient to support
a finding by clear and convincing evidence that she committed acts supporting termination
on the above statutory grounds. Consequently, our focus is solely directed at assessing
whether the evidence demonstrated that termination of appellant's parental rights was in
her children's best interest.

C. Best Interest of the Children

 "[A] fact finder may infer that past conduct endangering the well being of a child may
recur in the future if the child is returned to the parent." (14) In this case, the Department
presented evidence establishing appellant's history of unstable housing, unstable
employment, unstable relationships, mental health issues, and drug usage.

 From this evidence and from the evidence set out in the statutory grounds for
termination analysis above, (15) the trial court could have determined that the identified risk
factors established endangerment to the children's well-being in the past and could have
inferred that the risk factors would continue to be present thus endangering the children's
well-being in the future if the children are returned to appellant. (16) From this evidence, the
trial court could have also inferred that appellant's past inability to appropriately care for
her children as established by her mental health issues and her unstable housing,
employment, and relationships, is indicative of the quality of care appellant is capable of
providing any of the children in the future. (17) Furthermore, considering appellant's drug use,
the trial court could have concluded that, in the future, similar unsuitable conduct might
occur. (18) Because there is evidence that appellant's past actions were unsuitable, the trial
court could have inferred that similar unsuitable conduct could recur in the future if the
children are returned to appellant. (19) Therefore, we are not persuaded by appellant's
contention that the evidence is factually insufficient because appellant provided some
evidence that the conduct and circumstances which prompted removal of the children did
not exist at the time of trial. (20)

 Moreover, "[t]he Texas Supreme Court has compiled factors to consider when
determining the best interest of a child." (21) Nine non-exhaustive factors set forth by the
supreme court in Holley v. Adams, (22) include the following: desires of the child; emotional
and physical needs of the child now and in the future; emotional and physical danger to the
child now and in the future; parenting abilities of the parties seeking custody; programs
available to assist these persons; plans for the children by parties seeking custody; stability
of the home or proposed placement; acts of omissions committed by the parent which may
indicate that the existing parent-child relationship is not a proper one; and any excuse for
the acts or omissions committed by the parent. (23) The absence of evidence about some
of these facts does not preclude a factfinder from reasonably forming a strong conviction
or belief that termination is in the child's best interest. (24)

 In light of the entire record and giving due deference to the trial court, we conclude
that the evidence in this case is factually sufficient to support certain Holley factors,
including the children's emotional and physical needs now and in the future, the emotional
and physical danger to the children now and in the future, and the acts or omissions of the
parent which may indicate that the existing parent-child relationship is not proper. (25) Thus,
we conclude that the Department presented enough evidence from which the trial court
could reasonably have formed a firm conviction or belief that each child's best interest
warranted termination. (26) We overrule appellant's sole issue.

III. Conclusion

 The trial court's judgment is affirmed. 





 

 LINDA REYNA YAÑEZ,

 Justice





Memorandum opinion delivered and filed 

this the 31st day of August, 2007.

1. See Tex. Fam. Code Ann. § 161.001(1)(D), (E), (N), (O), (P) (Vernon Supp. 2006).
2. The father of K.A. is unknown and the father of E.A. is Jesse Novello. The fathers of K.A. and E.A.
also had their parental rights terminated. There being no appeal from that part of the judgment terminating
their rights, that part of the judgment has become final.
3. We comment here only to acknowledge that the admissibility of appellant's drug test results was an
issue of controversy at trial. Appellant's counsel made a significant number of objections against any
testimony relating to appellant's drug tests; these objections were typically sustained. All references to drug
tests in this opinion's factual background, however, stem from testimony that encountered either an overruled
objection or no objection at all.
4. Dr. Raymond Lewandowski, a clinical geneticist, testified at trial. K.A.'s foster mother sent K.A. to
Dr. Lewandowski because she wanted to know the cause of the child's "global developmental delay and some
physical features." After examining K.A., Dr. Lewandowski concluded that K.A. had physical features that
were "consistent with a child that had been exposed to drugs during pregnancy." He testified that it was
"[u]nlikely" that the physical features in question were caused by something else.
5. The individual appellant was divorcing was not E.A.'s biological father. Appellant testified that E.A.'s
biological father has played no part in his life.
6. Including this incident, appellant has attempted suicide a total of three times. E.A. was never
present for any of these attempts.
7. See Tex. Fam. Code Ann. § 161.001.
8. Id. § 101.007 (Vernon 2002).
9. In re C.H., 89 S.W.3d 17, 25 (Tex. 2002).
10. Castaneda v. Tex. Dep't of Protective & Regulatory Servs., 148 S.W.3d 509, 523 (Tex. App.-El
Paso 2004, pet. denied).
11. Id.
12. Id.
13. Id.
14. Williams v. Williams, 150 S.W.3d 436, 451 (Tex. App.-Austin 2004, pet. denied) (citing In re D.L.N.,
958 S.W.2d 934, 941 (Tex. App.-Waco 1997, pet. denied), disapproved on other grounds by In re J.F.C., 96
S.W.3d 256, 267 (Tex. 2002) and In re C.H., 89 S.W.3d at 26).
15. See In re C.H., 89 S.W.3d at 28 (providing that evidence that proves one or more statutory grounds
for termination may also constitute evidence illustrating that termination is in the child's best interest).
16. See Williams, 150 S.W.3d at 451; D.L.N., 958 S.W.2d at 934.
17. See D.O. v. Tex. Dep't of Human Servs., 851 S.W.2d 351, 356 (Tex. App.-Austin 1993, no writ).
18. See id.
19. See Williams, 150 S.W.3d at 451.
20. The trial court had reason to disbelieve appellant's contention that her character had changed for
the better after being released from prison. First, appellant admitted that she continued to test positive for
drug use after being released from prison. Second, the trial court may have found appellant's two month
possession of a job and three week possession of an apartment to be evidence that was too tenuous to
support a firm belief that appellant would not repeat the same problematic behavior and encounter the same
problematic circumstances that had plagued her past.
21. In re J.I.T.P., 99 S.W.3d 841, 846 (Tex. App.-Houston [14th Dist.] 2003, no pet.) (citations omitted).
22. Holley v. Adams, 544 S.W.2d 367, 372 (Tex. 1976).
23. Id.
24. In re C.H., 89 S.W.3d at 27; see In re D.M., 58 S.W.3d 801, 814 (Tex. App.-Fort Worth 2001, no
pet.) (explaining that the determination of best interest does not require proof of any unique set of factors, nor
does it limit proof to any specific factor).
25. See Holley, 544 S.W.2d at 372; In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).
26. See In re D.S.A., 113 S.W.3d 567, 574 (Tex. App.-Amarillo 2003, no pet.).